TERRE HAUTE & I. R. CO. et al. v. COX et al.

(Circuit Court of Appeals, Seventh Circuit. May 18, 1900.)

No. 509.

1. RAILROADS—CONSTRUCTION OF LEASE—DIVISION OF EARNINGS.

A provision of a lease, by which one railroad company leased its road to another, that the lessee "shall, in each and every year of the term demised, pay or cause to be paid to said [lessor], in the manner and at the times hereinafter specified, thirty per centum of the gross earnings of the demised property," is not one for the payment of rental, but for the division of the earnings of the property, as earnings; and under it 30 per cent. of such earnings become, in equity, the property of the lessor at once on their receipt, being held by the lessee in trust for the purpose specified in the lease.

2. SAME—LESSOR'S SHARE OF EARNINGS—RIGHT TO RECOVER AS TRUST FUND.

The lessee in such lease having failed for six months before the time its property went into the hands of a receiver to pay over the lessor's share of the earnings of the leased road, and having mingled the same with its own funds, bondholders of the lessor, the interest on whose bonds the lessee was required by the terms of the lease to pay from such funds, were entitled to have the amount so misapplied to the benefit of the lessee restored by the receiver from the subsequent earnings of the leased road under the receivership, and paid to them in accordance with the contract, as against the lessee company or its bondholders or general creditors; and it is immaterial that the lessee may have operated the road at a loss.

3. SAME—LEASE ULTRA VIRES—EFFECT OF CURATIVE STATUTE.

A lease by a railroad company of a line of road in another state, although unauthorized when made by the company's articles of incorporation or by statute, is rendered valid as to the future by an act of the legislature subsequently passed conferring such authority, where the company continues for years thereafter to operate the road thereunder, and thereby impliedly readopts the contract.

4. STATUTE—CONSTITUTIONALITY—SPECIAL LAWS.

The Indiana act of February 20, 1893, legalizing all leases theretofore made within a specified time by any railroad company of the state authorized to construct and operate a railroad to its western boundary, by which such company contracted to operate the road of an Illinois company authorized to construct and operate a road to such boundary, is not in contravention of article 4, § 23, of the state constitution, which provides that laws shall be general and of uniform operation in all cases where a general law can be made applicable.

Appeal from the Circuit Court of the United States for the District of Indiana.

On and before October 30, 1896, the Terre Haute and Indianapolis Railroad Company owned and operated a line of railroad extending from Indianapolis to the state line between the states of Indiana and Illinois, and as lessee operated the St. Louis, Vandalia and Terre Haute Railroad, extending from a junction with the Terre Haute and Indianapolis Railroad at said state line to

East St Louis; the Terre Haute and Peoria Railroad, extending from a junction with the St. Louis, Vandalia and Terre Haute Railroad near said state line to Peoria, Illinois; the Terre Haute and Logansport Railroad, extending from Terre Haute to South Bend, Indiana; and the Indiana and Lake Michigan Railroad, extending from a junction with the Terre Haute and Logansport Railroad at South Bend to St. Joseph, Michigan.

Among the provisions in the lease from the Terre Haute and Peoria Railroad to the Terre Haute and Indianapolis Railroad Company, dated October 1, 1892, was the following: "The said Terre Haute and Indianapolis Railroad Company shall in each and every year of the term demised, pay or cause to be paid to said Terre Haute and Peoria Railroad Company, in the manner and at the times hereinafter specified, thirty per centum of the gross earnings of the demised property and such percentage of the gross earnings shall be paid without any deduction, abatement or diminution for any cause whatever; and it is expressly agreed that there shall be paid out of the aforesaid thirty per centum the interest as it matures on the bonds of the Terre Haute and Peoria Railroad Company of the issue of $1,800,000 of March 1, 1887, which shall be outstanding, and of the issue of $2,500,000 of September 1, 1892, at any time outstanding; all federal, state and municipal taxes and assessments imposed upon the demised estate; all rentals for the use of the tracks of the Toledo, Peoria and Western Railroad, Illinois Central Railroad and Terre Haute and Indianapolis Railroad, which are now used by the party of the first part.

"It is agreed that the second party may and shall pay the interest on the said bonds as the same mature, the said taxes, assessments and rentals as they respectively become payable, and such payments shall be held to be a discharge and payment by the party of the second part on account of said thirty per centum of gross earnings. If the aggregate amount of said interest, taxes and rentals shall be less than the total amount of said·thirty per centum of the gross earnings, the residue shall be paid in cash to the first party; should the amount of such interest, taxes and rentals be in excess of the total amount of said thirty per centum of gross earnings in any year, such excess shall be paid by and be held and retained by the said second party as a charge against the party of the first part to be repaid or retained by it out of any future excess, but without interest.

"The manner and times of payment herein provided for are as follows:

"Within sixty days after the close of each year ending on the last day of October, the aggregate gross earnings for the whole year shall be ascertained, and the residue, if any, of the thirty per centum of said gross earnings remaining after the payment of said interest, taxes, assessments and rentals by the party of the second part, as herein provided, shall be paid to the party of the first part."

A provision in the lease under which the Indianapolis Company was operating the St. Louis, Vandalia and Terre Haute Railroad provides that the lessees shall receive seventy per centum of the gross receipts derived from the operation of the demised property as a consideration for working and maintenance expenses, the remaining thirty per centum to be appropriated, (1) to the payment of interest on the first and second mortgage bonds of the lessor company; and (2) the surplus of said thirty per centum to be paid over to the lessor company semi-annually, to be disposed of by it for the benefit of its stockholders.

There is a further provision that if the thirty per centum shall not be sufficient in amount to protect the interest on the mortgage bonds, and the sinking fund therefor as they mature from time to time, together with the payment of taxes and proper cost of maintaining organizations, the lessee shall advance for the lessor whatever amount may be needed to be accounted for under the yearly averages of the lease during its existence.

October 30, 1896, the appellees, Cox and Blair, citizens of the State of New Jersey, and appellee, Paul, a citizen of the State of Pennsylvania, in behalf of themselves and all other holders of bonds issued under and secured by two deeds of trust executed by the Peoria Company under dates respectively of March 1, 1887, and September 1, 1892, who should come in and contribute ·to the expense of the suit, brought their bill in the Circuit Court of the United States for the District of Indiana against the Indianapolis Company, a cor-

poration of Indiana, for specific performance of the foregoing provision of the lease of the Peoria Company requiring the lessee to apply thirty per centum of the gross earnings of the demised property to the payment of interest on the lessor company's bonds, and enjoining lessee from appropriating such thirty per centum of the gross earnings, except as in the lease specified; and if necessary for the appointment of a receiver of the funds received by the lessee arising from the operation of the various lines leased, or if the lessee be insolvent, for the appointment of a receiver to operate the lessee's road, and the leased lines. Before answer the bill was amended by averring the insolvency of the lessee railroad.

November 13, 1896, the Indianapolis Company answered admitting insolvency.

On the same day the cause was heard upon the bill and answer, and the lessee railroad united in the motion for the appointment of a receiver. Volney T. Malott was appointed receiver of the lessee railroad and of its leased lines situated in the states of Indiana, Illinois and Michigan.

The decree appointing the receiver contains the following provisions:

"And it is further ordered, adjudged and decreed that the said receiver shall keep true and accurate books of account showing the receipts derived from the operation of the said railroads, and the manner and purpose of the expenditures thereof, and that in said books of account he keep separate and distinct accounts showing the amount of the gross earnings derived from the operation of the Terre Haute and Peoria Railroad Company, and in like manner separate accounts showing the gross earnings derived from the operation of each of the other railroads leased by the said defendant company, and separate accounts showing the gross earnings derived from the operation of the railroad of the defendant company itself. That thirty per cent. of the gross earnings derived from the operation of the said Terre Haute and Peoria Railroad Company, and twenty-five per cent. of the gross earnings derived from the operation of the Terre Haute and Logansport Railroad Company, and of the Indiana and Lake Michigan Railroad Company, respectively, and thirty per cent. of the gross earnings derived from the operation of the St. Louis, Vandalia and Terre Haute Railroad Company, be respectively set apart and held by the said receiver, as a separate and distinct fund in each case, be deposited by him in separate bank accounts, specially designated so as to indicate the property from which such deposits are derived in each case, and that no part of such percentage so set apart and deposited be paid out or applied except on the special order of this court, made upon notice to the complainants herein or their solicitors, and such other parties as may hereafter appear in this cause.

"And said receiver shall make monthly reports to this court showing the receipts aforesaid, and the cost of operation of each of the said leased lines and of the main line of railroad, and also showing the method by which the incomes and expenses of said lines are respectively ascertained, and in case the balance of the gross earnings derived from the operation of any of the said leased lines shall be insufficient to meet the expenses of the same, then the said receiver shall advance and meet any such deficiency out of the gross earnings of the main line of railroad of the said defendant company if the same shall be sufficient therefor, and if not sufficient, he shall report the matter to this court, and apply for instructions in the premises, having first given notice to all parties to this suit of the time and place of such application."

The receiver's report for the month of October, 1897, shows that "he has kept separate and distinct accounts showing the amount of the gross earnings derived from the operation of the Terre Haute and Peoria Railroad property, of the St. Louis, Vandalia and Terre Haute Railroad property, of the Terre Haute and Logansport Railroad property and of the Indiana and Lake Michigan Railway property, and has set apart to the separate and distinct funds the required percentages of the gross earnings of each of said properties; that under the direction of this court * * * he has paid out of the said funds the amounts for purposes hereinafter shown, and after making the deductions of those amounts the several funds stand as follows, to wit: Vandalia fund, $119,468.54; Logansport fund, $53,831.48; Lake Michigan fund, $14,692.17; Peoria fund, $68,971.45."

In the receiver's report the Peoria fund, in detail, is arrived at as follows:

"Balance forward.................................. $57,752.38
30% October, 1897, earnings....................... 13,202.40
                                                   _____
                                                   $70,954.78
Less track rentals for October, 1897, T. H. & I. R.
  R. Co........................................ 250.00
Illinois Central R. R. Co....................... 1,083.33
T. P. & W. R. R. Co............................ 650.00     1,983.33
                                                        _____
    Balance on hand.............................          $68,971.45."

The lease of the Terre Haute and Peoria Railroad Company to the Terre Haute and Indianapolis Railroad Company further provides that the lessee should by suitable indorsement guarantee the payment of the principal and interest of said bonds. Pursuant to this provision the guarantee of the lessee was indorsed upon the bonds.

It appears that for the year ending October 31, 1893, the gross earnings of the Peoria Company were $449,520.33; for the year ending October 31, 1894, $404,914.69; and for the year ending October 31, 1895, $445,483.00.

It is averred in the bill upon which the receiver was appointed, and nowhere denied, that the amount of gross earnings received from the Peoria Railroad by the Indianapolis Company from the 31st of October, 1895, to September 1, 1896, was about $340,000.00, and that said earnings would, on October 31, 1896, be about $400,000.00; but that the said earnings so received by the said Indianapolis Company were by it paid into its treasury, and mingled with any and all of its other moneys, and that no part was, in any way, specifically set aside as a special fund for the payment of the sums provided for in the lease.

It is averred, also, and not denied, that thirty per centum of the gross earnings of the Peoria Railroad, from the first of October, 1892, were appropriated by the Indianapolis Company; and that the payments of the purposes provided for in the lease include interest on the bonds of the Peoria Railroad to and including March 1, 1896. The first failure to make such appropriation was upon the interest coupons falling due September 1, 1896.

The Acts of the General Assembly of the State of Indiana relating to the power of railway companies to guarantee the bonds of other railway companies are as follows: "That the board of directors of any railway company organized under and pursuant to the laws of the state of Indiana, whose line of railway extends across the state in either direction, may, upon the petition of the holders of a majority of the stock of such railway company, direct the execution by such railway company of an indorsement guaranteeing the payment of the principal and interest of the bonds of any railway company organized under or pursuant to the laws of any adjoining state, the construction of whose line or lines of railway would be beneficial to the business or traffic of the railway so endorsing or guaranteeing such bonds." Act March 8, 1883, § 1.

Also, "That any and all leases or operating agreements entered into since the first day of June, A. D. 1892, by and between a railroad company under the laws of the state of Illinois, with authority to construct and operate a railroad to the western boundary line of the state of Indiana, and a railroad company organized under the laws of the state of Indiana, with authority to construct its railroad to the boundary line aforesaid, by the terms of which the railroad company of this state is to take possession of and operate the railroad and property of said company of the state of Illinois upon terms and conditions in any such lease or operating contract specified are hereby made of the same force and effect as if the authority on the part of the Indiana company to make and perform a lease or operating contract of a railroad in the state of Illinois had at the date thereof been fully conferred and granted under the laws of the state of Indiana." Act Feb. 20, 1893, § 1.

January 6, 1898, the appellees filed their petition in the court below praying for an order directing the receiver to pay the interest on the bonds of the Peoria Company falling due September 1, 1896, out of the balance to the credit of the Peoria fund.

This petition the Indianapolis Company answered, averring that it was indebted to sundry unsecured creditors in the sum of $726,074.94 with interest; $154,766 of which was for supplies purchased within six months prior to the appointment of the receiver; and $213,522 for cars purchased of and delivered to it by the Pittsburg Locomotive and Car Works, also within six months prior to the appointment of the receiver; and that a suit was pending in the Superior Court of Marion County, Indiana, on behalf of the State of Indiana against the railroad company, to recover two millions of dollars claimed to be due under its original charter.

The answer further averred that the receiver had not realized any net earnings from the operation of the Peoria Railroad, but had operated it at a loss amounting on October 31. 1897, to $13,692.75; that the money known as the Peoria fund did not represent the earnings of the receiver from the Peoria Railroad. but was earned by the receiver in the operation of the Indianapolis Railroad; that the appellees had no lien on said fund; that if the receiver were to pay the rentals as stipulated in the lease, the loss in the operation of the Peoria Railroad up to October 31, 1897, would amount to $82,644.20, as shown by the receiver's report on file; that the loss of the defendant in operating the Peoria Railroad under said lease amounts to $380,145.83 up to October 31. 1896; that the Peoria Company is indebted to the Indianapolis Company for sundry sums of money amounting to $7,267.91 for betterments accruing prior to the appointment of the receiver.

The answer challenges the guarantee of the bonds of the Peoria Company by the Indianapolis Company as ultra vires; insists that the money in the hands of the receiver should be distributed first among the company's creditors who furnished supplies and equipments within six months prior to the appointment of the receiver, and that the residue should be paid ratably to the unsecured creditors: and prays for a direction by the court relieving the receiver from any obligation to the Peoria Company beyond the net earnings of said road.

The Pennsylvania Company filed an intervening petition, showing that within six months prior to the appointment of the receiver the Pittsburg Locomotive and Car Works sold and delivered to the Indianapolis Company for use upon the line between Indianapolis and St. Louis twenty-two locomotives, for the purchase price of which the Indianapolis Company executed its notes amounting in the aggregate to $215,522. bearing interest at the rate of five per centum, one falling due December 1, 1896, and one on the first day of each succeeding month; that the petitioner is the owner of seventeen of such notes on which there was due from the Indianapolis Company for principal and interest $90,595.87; that the petitioner has no security for said debt. The petition, in effect, adopts the averments of the answer respecting the indebtedness of the Indianapolis Company, the losses from the operation of the Peoria Railroad, and the manner in which the Peoria fund is computed, and charges that the guarantee provided for in the lease is ultra vires, and prays for a distribution of the fund ratably between the petitioner and other creditors falling within the six months' rule.

The Vandalia Company also intervened, filing its petition, averring that there is due to it from the Indianapolis Company for rentals up to November 14, 1896, under the lease of February 10. 1868. the sum of $63,989.15 with interest; that there is also due a balance of $119,396.04 on account of rentals due to it under said lease from the time of the appointment of the receiver to October 31. 1897: and praying that the $119,396.04 to the credit of the Vandalia fund be paid to the petitioner on account of rentals, and that the railroad company be also required to pay to the petitioner the further sum of $63,989.15 with interest thereon.

March 19, 1898, the following order was entered by the Circuit Court: "And the court having fully considered the matters and things set forth in said petition and in the answer thereto of said The Terre Haute and Indianapolis Railroad Company, defendant herein, and being fully advised in the premises, finds that the prayer of the said petition should be granted.

"It is therefore ordered by the court that Volney T. Malott, receiver herein, be and he is hereby directed to apply the sum of $55,750, and in addition so much as may be necessary, of the fund now in his possession arising from set-

ting apart thirty per cent. of the gross earnings of the Terre Haute and Peoria Railroad property, known and designated as the Peoria Fund, to the payment of the coupons which fell due September 1, 1896, on all the outstanding mortgage bonds of the Terre Haute and Peoria Railroad Company, together with interest on said coupons at the rate of six per cent. per annum, from September 1, 1896, until the amount necessary to pay said coupons is deposited for that purpose in the City of New York, State of New York."

From this order each of the appellants prosecutes its several appeal to this court.

Lawrence Maxwell, for appellants.

John G. Williams and George W. Wickersham, for appellees.

Before JENKINS and GROSSCUP, Circuit Judges, and SEAMAN, District Judge.

After stating the facts as above, GROSSCUP, Circuit Judge, delivered the opinion of the court.

The lease, whereby the Indianapolis Company obtained possession of the Peoria Railroad, entered into October 1, 1892, in effect provides, that out of the gross earnings received by the former company from the operation of the latter railroad, thirty per centum shall be set apart, to be applied, (a) to the payment of interest as it matures upon the bonds of the Peoria Company, (b) to the payment of all the Peoria Company's taxes and assessments, federal, state and municipal, (c) to the payment of rentals for the use of the tracks of other roads which, under an existing arrangement, were used by the Peoria Company; and (e) the residue, if any, to be paid to the Peoria Company.

From the date of this lease until September 1, 1896, a period of nearly four years, the Peoria Railroad was operated by the Indianapolis Company, and the sums contemplated—thirty per centum of the gross earnings—were, from time to time, set apart and applied, as provided for in the lease. March 1, 1896, the last appropriation, in pursuance of this provision of the lease, was made. September 1, 1896, the Indianapolis Company, for the first time, refused to set any sum apart from the gross earnings of the Peoria Railroad for the payment of interest on the Peoria Company's bonds. This refusal, covering the earnings of the road from March 1, 1896, until September 1, 1896, is the occasion of the controversy before the court.

It is apparent from the record that if the Indianapolis Company is under obligation, under the terms of the lease, to hold thirty per centum of the gross earnings of the Peoria Railroad as a fund out of which to pay the Peoria Company's interest coupons, the mingling of this thirty per centum with the other moneys in the company's treasury was a violation of its duty, as trustee, to the Peoria Company and its bondholders. Counsel for the appellant, however, challenge the proposition that the provisions of the lease amount to an appropriation in præsenti of the earnings of the Peoria Railroad, and that the Indianapolis Company stands in the attitude of a trustee to the Peoria Company and its bondholders. The contention thus raised lies at the threshold of this case.

In Bradley's Case, Ridg. t. Hardw. 194, a promise had been made by the debtor to pay the creditor out of a specific debt due to the debtor from another. The bill was to stay the money in the hands

of the third person (the debtor's debtor), for fear that the debtor, upon receiving it, would misapply it. The bill was dismissed by Lord Hardwicke, who said:

"If a debtor promises to pay his creditors out of the money to be recovered in a certain suit, and on the faith of this promise the creditor forbears to sue him, this creates no specific lien on the money recovered."

In Trist v. Child, 21 Wall. 441, 22 L. Ed. 623, the defendant had a claim against the United States government out of which, when collected, he promised to pay the plaintiff twenty-five per centum. The claim having been allowed, a bill was filed to enjoin the defendant from withdrawing the money from the Treasury until he had complied with his agreement to pay the plaintiff. The plaintiff's contention was that, under the circumstances, he had a lien upon the fund. In disposing of this contention, the court said:

"It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. A part of the particular fund may be assigned by an order, and the payee may enforce payment of the amount against the drawee. But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund pro tanto, either by giving an order or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor."

Dillon v. Barnard, 21 Wall. 430, 22 L. Ed. 673, was a case in which a contractor was engaged in the construction of a portion of a railroad, under a contract with the railroad company assented to by two of the trustees under the railway's mortgage, whereby payments were to be made monthly of ninety per centum of the work done, and the remaining ten per centum to be paid after the completion of the work.

The object of the railway mortgage was to provide for, and retire all, the then existing mortgage debts and prior liens upon the line of road, and to complete and equip the road, the latter including the complaining contractor's work. Before the payment of the ten per centum the railroad company became bankrupt. The contractor contended that, under the purpose, object, intention, and understanding of the parties, the railway company's obligation to the contractor for the work done became a charge upon the proceeds of the sales of the bonds; and that the money thus realized became appropriated to, and ought to have been used for, the discharge of the debt due to the contractor.

In deciding the case, Justice Field said:

"In support of his pretension he insists that under the indenture his contract, when it obtained the assent of two of the trustees, became a charge upon the moneys received by the corporation from the sale of the bonds; that the trustees under the mortgage and the corporation thereupon became trustees for his benefit of the proceeds thus received, and were bound to apply them to pay his debt; that by their failure to have the proceeds thus applied, and by expending them in acquiring new property and improving that already possessed, the charge upon the proceeds became attached to the property in the hands of the trustees thus added to and improved; and that this charge is entitled to preference over the lien of the bondholders.

"The positions thus asserted must find their support, if at all, in the provisions of the indenture of mortgage. If not sustained there they are not sus-

tained anywhere. * * * The instrument was executed to secure the payment of the mortgage bonds; it so declares on its face. It nowhere indicates any design to secure the contractors; its language is, 'that for the better securing and more sure payment of the sums of money mentioned in the said mortgage bonds, and each of them,' the indenture is executed. * * * The contractors are not parties to the indenture, and are not entitled to claim as against those parties any benefit under its provisions, except that upon the assent being given to their contracts the use of the moneys for their payment is permissible. They are, so far as the agreement is concerned, strangers to the instrument. The written assent to contracts on the part of one of the trustees, was not required for their protection, but as an additional safeguard to the bondholders against an improvident use of the funds of the corporation. * * * The present case, notwithstanding the largeness of the plaintiff's demand, is not different in its essential features from those cases of daily occurrence, where the expectation of a contractor, that funds of his employer derived from specific sources will be devoted to the payment of his services or materials, is disappointed. Such expectation, however reasonable, founded even upon the express promise of the employer that the funds shall be thus devoted, of itself avails nothing in favor of the contractor. Before there can arise any lien on the funds of the employer, there must be, in addition to such express promise, upon which the contractor relies, some act of appropriation on the part of the employer depriving himself of the control of the funds, and conferring upon the contractor the right to have them applied to his payment when the services are rendered or the materials are furnished. There must be a relinquishment by the employer of the right of dominion over the funds, so that without his aid or consent the contractor can enforce their application to his payment when his contract is completed."

In Rogers v. Hosack's Adm'r, 18 Wend. 319, cited with approval in Trist v. Child, supra, there was a covenant on the part of one Gracie to pay Rogers & Sons "out of any moneys received from the French government, on account of certain large claims and demands which Gracie had against the French government," and that the same should "be paid out of said moneys when and as soon as the same should be received by said Archibald Gracie, his executors, administrators or assigns." This was held to create no equitable assignment or trust, the court saying:

"Here is no assignment, no mortgage or pledge, no order, or any other specific appropriation of the French funds, but a mere covenant to pay them over on their being obtained by the covenantor."

It is needless to pursue this class of cases further. Those already cited illustrate, with sufficient definiteness, the lines pursued by the courts in denying claims for liens in cases of that character. The doctrine on which they go may be summed up in the following paragraph from 2 Hare & W. Lead. Cas. p. 233:

"A covenant on the part of the debtor to apply a particular fund in payment of the debt as soon as he receives it, will not operate as an assignment, for it does not give the covenantee a right to the fund, save through the covenantor, and looks to a future act on his part as the means of rendering it effectual."

In none of these cases did the party claiming the lien contribute any property to a common undertaking; in none of them was the fund under consideration the fruit of a joinder of property interests. In each, the fund in question arose out of property rights that belonged solely to the party resisting the claim of lien, and that, but for his promise to set apart a portion of the fund, remained his sole property. There was no change of dominion, no setting apart of a portion;

no present act of appropriation, as distinguished from a mere promise to that end. A lien of the character claimed can not rest in a mere personal promise; it must grow out of some circumstance or act entering into the creation of the fund—some equity founded in facts—other than the mere word of the party that a trust will be observed.

The case we are now considering is clearly distinguished, in this controlling respect, from those cited. Two railroad companies, each possessing, and separately operating, a railroad, found it advisable to unify the operation of their roads. They chose, in the execution of the project, that one company should operate, as one line, both roads. The undertaking was, in a certain sense, a joint one; each contributed a part of the means whereby it should be carried out. It certainly was within legal competency, either that the operating company should pay a strict rental for the use of the other's property, or that the earnings of the road, gross or net, as an entirety—the fruit of the joint enterprise—should be divided according to the agreement of the parties.

An inspection of the lease shows that the rental alternative was not adopted. The language is:

"The said Terre Haute and Indianapolis Railroad Company shall in each and every year of the term demised, pay or cause to be paid to said Terre Haute and Peoria Railroad Company, in the manner and at the times hereinafter specified, thirty per centum of the gross earnings of the demised property."

There is no word respecting rentals; there is no plain inference that the thirty per centum thus agreed upon shall be a mere measure of rentals. It is, as indisputably as language can make it, a plain division of the earnings between the parties whose properties, taken together, produce the earnings. Unless an arrangement for division of earnings, as earnings, is in law an impossibility, the language employed can bear no interpretation, other than a contemplated division of earnings, as earnings. It is framed to exactly fit the expression of such a purpose.

It is not insisted that this agreement amounted, at law, to an assignment of the moneys to be earned in futuro; but we are unable to see why, in equity, upon the interpretation we have given to the lease, the thirty per centum is not, immediately upon receipt, already set apart and appropriated to the obligations of the Peoria Company named in the lease. What dominion in equity does the Indianapolis Company possess, except to apply this portion to the objects set forth? The money constituting the thirty per centum, as well as the remaining seventy per centum, is, it is true, physically in possession of the Indianapolis Company, but equitably and beneficially becomes, the moment it is earned, the property of the Peoria Company, for the purpose of paying interest on its bonds, its taxes, rentals, etc.

It is clear to us, then, that in the case under consideration the duty of the Indianapolis Company, in respect to the thirty per centum of gross earnings, does not arise out of its mere promise; it is an equity growing out of the conditions from which the unified railway lines arose. The division of the earnings does not rest in an intention merely to be executed in the future; it is to be re-

102 F.—53

garded, in equity, as a present fact, made so by the circumstances, together with the agreement that brought about the means creating such earnings. We have no license to make a contract between the parties; and a holding different from the one here indicated would, in effect, substitute a contract conceived by us for the contract assented to by the parties.

The case is, in this respect, different from New York, P. & O. R. Co. v. New York, L. E. & W. R. Co. (C. C.) 58 Fed. 268. In that case the language of the lease was as follows:

"As rental for the said demised premises the Erie Company agrees that whenever the annual gross earnings of the demised premises, ascertained as herein provided, are less than or equal to six million of dollars ($6,000,000), the Erie Company shall retain sixty-eight (68) per centum thereof, and pay to the Ohio Company the remaining thirty-two (32) per centum thereof."

In interpreting this language the court, through Lurton, Circuit Judge, said:

"The rental is determined by the amount of gross earnings. These earnings belong to the lessee company. The complainant has no right to any specific dollar or part of a dollar. The rent is simply measured by the earnings."

We are of the opinion that the case of Bank v. Smith, 30 C. C. A. 133, 86 Fed. 398, is more nearly in point. In that case the Central Vermont Railroad Company operated the Ogdensburg & Lake Champlain Railroad under an agreement containing the following provisions: "That all the gross earnings, income, and receipts of and from the business traffic and rentals of said railroad and other property, and referred to in article second of this agreement, shall in each year and annually during the continuance of this agreement be applied and disposed of by the party of the second part as follows," in substance, first, toward the expense of operation and maintenance of the railroad, including taxes and repairs, of the Ogdensburg & Lake Champlain Railroad Company; secondly, to the payment of interest upon the consolidated mortgage bonds of the Ogdensburg & Lake Champlain Railroad Company; and thirdly, to the payment or adjustment of the liabilities of the Ogdensburg & Lake Champlain Railroad Company upon bonds of the Lamoille Valley Extension Railroad Company; the residue to be divided between the Central Vermont Railroad Company and the Ogdensburg & Lake Champlain Railroad Company.

In disposing of the question raised, the court, through Wallace, Circuit Judge, says:

"It is conceded by all parties that the fund should be distributed according to the terms of the lease. The lease is the origin of the funds in the hands of the receivers, and they acquire the fund cum onere. * * * The covenant to pay interest upon the bonds was one which could have been enforced by the trustees of the bondholders in an action against the lessee. * * * The former" (the covenant to pay interest upon the bonds) "gave to the bondholders an equitable lien upon the earnings, because the trustee could have compelled the lessee to apply the earnings to the payment of interest."

The doctrine we adopt in the disposal of this question is summed up in Pomeroy's Equity Jurisprudence as follows:

"The doctrine is carried still further and applied to property not yet in being at the time when the contract is made. It is well settled that an agreement

to charge, or to assign, or to give security upon, or to affect property not yet in existence, or in the ownership of the party making the contract, or property to be acquired by him in the future, although, with the exception of one particular species of things, it creates no legal estate or interest in the things when they afterwards come into existence or are acquired by the promisor, does constitute an equitable lien upon the property so existing, or acquired at a subsequent time, which is enforced in the same manner and against the same parties as a lien upon specified things existing and owned by the contracting party at the date of the contract." Volume 3 (2d Ed.) § 1236.

Assuming, then, that the Indianapolis Company held the thirty per centum of the gross earnings in trust for the Peoria Company and its bondholders, and that the intermingling of this trust money with its general moneys was a violation of its duty, as such trustee, the inquiry arises, should the receiver be ordered, out of the so-called Peoria Fund, to make good the loss to the Peoria Company's bondholders?

It will be observed that this question does not necessarily involve the inquiry whether the receivers have adopted the lease, or whether, since obtaining possession of the road by the appointment of the court, the receivers should continue to divide the gross earnings according to the terms of the lease. The whole question as to the receivers' liability to the Peoria bondholders for sums earned after the first of September, 1896, is still in abeyance.

But any uncertainty of this kind can not affect the right of the court to fulfill, out of the subsequent earnings, the obligation of the Indianapolis Company arising from its misappropriation of the funds during the six months immediately preceding the appointment of the receivers—funds of which the estate has received the benefit. Unquestionably the circuit court, as successor, through its receivers, to the Indianapolis Company, ought to return to the Peoria Company and its bondholders any moneys belonging to the Peoria Company and its bondholders that have come into its hands as a part of the assets of the Indianapolis Company. To such moneys the receivers have no better title than had the company whom they succeeded, and an equitable obligation resting upon the company, in respect thereto, comes over to the receivers.

The record does not show that the Peoria earnings for the preceding six months, withheld by the Indianapolis Company, came, in specie, into the possession of the receivers, nor does it show, with directness, that these moneys were spent upon the general operating expenses of the Indianapolis Company. But it is insisted, by the Indianapolis Company, that the excess of operating expenses over the earnings of the Peoria Railroad necessitated and justified the withholding of the thirty per centum; and the record shows that a large sum of money came into the hands of the receivers, as a part of the estate, at the time of their appointment. We may, therefore, we think, safely assume that that portion of the earnings which, otherwise, would have gone to the Peoria Company, came into the hands of the receivers, either as money, at the time they took possession of the road, or as a benefit, in virtue of the fact that they were consumed in the general operating expenses of the Indianapolis Company.

Indisputably the availability of these moneys for operating purposes saved the Indianapolis Company from taking a like sum from its other resources; and it is of no moment, in the disposition of this case, whether the assets coming to the receivers were actually increased by that amount coming in specie. It is enough that, in its outcome, the estate has received the benefit of this increment to its income. The estate, as an entirety, has been, to that extent, enlarged.

The principle is stated by Mr. Justice Bradley, in Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354, 33 L. Ed. 696, as follows:

"Formerly the equitable right of following misapplied money or other property into the hands of parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor."

See, also, Central Nat. Bank v. Connecticut Mut. Life Ins. Co., 104 U. S. 54, 26 L. Ed. 693; Oil Co. v. Hawkins, 46 U. S. App. 115, 20 C. C. A. 468, 74 Fed. 395.

Clearly, then, the Indianapolis Company, in its own right, could not oppose the restoration of these moneys to the Peoria Company. Can there be more effective opposition from the intervening general creditors whose claims are for supplies furnished within six months prior to the receivership? We think not. The terms of the lease, as we have interpreted it, were on public record, and creditors dealing with the Indianapolis Company must presumably have taken notice of the limitations imposed upon its right to the whole of the gross earnings. There is no warrant in equity for a disregard, in favor of creditors so dealing, of this cardinal provision of the arrangement between the parties.

No better equity exists in favor of the bondholders of the Indianapolis Company. It is averred that during the whole period of the lease the Peoria Railroad was operated at a loss, to meet which the funds were taken from the earnings of other branches of the general system; and it is contended that the order of the court appealed from, in effect, uses the moneys of the Indianapolis Company, earned in its other branches, to pay off the interest coupons due to the Peoria bondholders.

But it will not be insisted, we think, that the bondholders of the Indianapolis Company are entitled to the moneys equitably belonging to the Peoria bondholders, even though the arrangement under which they were earned was a losing one to the Indianapolis Company. The thirty per centum embraced in the order of the court, though mingled with the funds of the Indianapolis Company, never belonged equitably to that company, either in its own right, or in the right of its bondholders. In equity the moneys were always, notwithstanding the intermingling, the moneys of the Peoria Company. In view of these facts, the court clearly had the power, after the ap-

pointment of the receivers, to recognize the provisions of the lease, to the extent of restoring these moneys; and, in our opinion, it was the duty of the court to go at least to that extent.

This brings us, then, to the inquiry whether the Indiana Act of 1893 effectually validates the lease between the two companies. The act was evidently framed to cover that purpose. Its language aptly expresses the intention of the legislature to that end. What forbids its having the proposed effect?

It is said that a railroad corporation, unless authorized by its act of incorporation, or by other statutes, to so do, has no power to enter into a lease of this character; and that such a lease, if unauthorized by statute, is strictly ultra vires, unlawful, void, and incapable of being made good by ratification or estoppel. Louisville, N. A. & C. Ry. Co. v. Louisville Trust Co., 174 U. S. 552, 567, 19 Sup. Ct. 817, 43 L. Ed. 1130.

But the Act of 1893 is not wholly retrospective; it is prospective as well. With the proportion of gross earnings paid to the Peoria Company prior to the passage of this act this case has no concern; it deals only with the thirty per centum of gross earnings withheld, during a period of six months, beginning three years after the passage of the act.

From the moment the act was passed the two railway companies had the power to enter into a lease containing provisions such as are here sought to be enforced. Thenceforth such power existed under the laws of Indiana. Had the two companies, at any time thereafter, formally adopted the lease, under the act, giving authority, no one would insist that the lease was ultra vires.

An adoption of the lease, otherwise unauthorized, under an act conferring authority, must be distinguished from an attempted ratification without any new statutory authority. In the one case the law is changed, so that the contemplated agreement is no longer unlawful; in the other the contemplated ratification, if held valid, would, in effect, substitute, on the question of power, the will of the corporation for the will of the legislature.

But an adoption of the agreement embodied in the lease, in the light of the new power conferred, may be implied from conduct, as well as from a formal act of readoption. Three years of operation of the Peoria Railroad by the Indianapolis Company in accordance with the terms of this agreement leaves no doubt that the lease was consented to by the parties after they had the power to so consent. It is, in effect, especially in the absence of any averment to the contrary, as if the lease had been formally renewed after the passage of the Act of 1893. It is not an attempted overreaching of the law, by ratification of an unauthorized act; but is in effect a readjustment of the companies' relations to the powers conferred by the new legislative authority.

We do not think the act to be in contravention of the Constitution of Indiana. The case of Mitchell v. McCorkle, 69 Ind. 184, is not in point. The Constitution of Indiana (section 22, art. 4) provides that:

"The general assembly shall not pass local or special laws in any of the following enumerated cases: Regulating the jurisdiction and duties of justices

of the peace and of constables; for the punishment of crimes and misdemeanors; regulating the practice in courts of justice; providing for changing the venue in civil and criminal cases; granting divorces; * * *"

Section 23 of the same article provides:

"In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the state."

The act under consideration in Mitchell v. McCorkle, supra, was a curative one relating to the regulation of practice in certain circuit courts of the state. It fell, therefore, within the enumerated cases in which the general assembly was prohibited from passing local or special laws.

But the Act of 1893 under consideration relates to no matter mentioned in section 22, art. 4; nor is it a case presenting an opportunity for the enactment of a more general law. Its purpose was to authorize the railroads organized under the laws of Indiana, and running to the western boundary thereof, to lease and operate roads lying outside of the state. Sufficient reason might exist for the giving of such authority to west-bound roads, as distinguished from north, east and south-bound roads. As the state is situated, west-bound roads may, standing apart, be the legitimate subject matter of legislation; and an act applying to them, as a separate subject matter, could not have been more general than the Act of 1893.

For the foregoing reasons, we are of the opinion that the order appealed from should be affirmed.