### FIRST NAT. BANK OF MONTGOMERY *v.* ARMSTRONG.

*(Circuit Court, S. D. Ohio, W. D.　May 10, 1888.)*

BANKS AND BANKING — INSOLVENCY — DRAFT FOR COLLECTION — TRACING PROCEEDS.

A draft sent to a bank specially indorsed for collection was paid by the drawee, by check, which the bank collected through the clearing-house. A memorandum was placed with the bank's cash, to indicate that the proceeds of the draft was the property of the sender. The bank was closed the next morning, and the receiver credited such proceeds to the sender of the draft on the books of the bank. *Held*, that the fund was not so mingled that it could not be traced and identified, and that the sender could recover the same.

At Law.

*Edward Colston*, for complainant.
*W. B. Burnet* and *E. W. Kittredge*, for respondent.

JACKSON, J., (*orally.*) The material facts of this case are the following: On the 16th June, 1887, the Montgomery Oil-Works drew its draft on the American Cotton-Oil Company of Cincinnati, for the sum of $2,379.56, in favor of the First National Bank of Montgomery, Ala. The payee forwarded the draft to the Fidelity National Bank for collection, under a special indorsement thereof, as follows: "Pay to Ammi Baldwin, cashier, or order, for collection, for account of the First National Bank of Montgomery, Ala." The draft so indorsed was received by the Fidelity National Bank, at Cincinnati, on June 18, 1887; was duly presented on that day for payment, and was paid and taken up by the drawee, who gave its check on the Citizens' National Bank of Cincinnati, to the Fidelity National Bank, for the amount of the draft. This check of the drawee, so accepted by the Fidelity National Bank, was received and treated as money. It was placed in the cash-drawer of said collecting bank as so much cash, and at the close of that day's business the amount of said collection was deducted from the total amount of cash on hand belonging to said Fidelity National Bank, and the letter of transmission from the First National Bank of Montgomery was placed in the cash-drawer of said collecting bank to indicate that said sum of $2,379.56 so deducted from the total cash, but still left in the cash-drawer in the shape of said check given by the drawee in tak-

ing up the draft belonging to the First National Bank of Montgomery. On June 20, 1887, the check of the drawee (the American Cotton-Oil Company) was collected by the Fidelity National Bank, through the clearing-house, by a change or exchange of credits, and the Fidelity National Bank thus actually realized and received the amount of said draft on the afternoon of June 20, 1887. At the close of that day's business the cash and cash assets of said Fidelity National Bank showed an excess over what actually belonged to it of $2,379.56; and to account for this excess, and to show to whom it really belonged, that amount was deducted from the total of cash and cash assets, and that same memorandum, in the shape of the transmitting bank's letter, was placed with the cash assets, to indicate the fact that $2,379.56 of the money in the cash-drawer of the bank was the property of the First National Bank of Montgomery, Ala. The clerk who transacted the business gives this account of the matter: In reply to the question as to what was done by the collecting bank, if anything, to distinguish the proceeds of said draft, or to indicate to whom said surplus of cash really belonged, he stated:

"Well, at the end of this day's business, [June 18, 1887,] as that money was not remitted, by order of Harper, [the vice-president,] and as they, the First National Bank of Montgomery, had no regular credit account with the Fidelity, instead of remitting it we simply took that much off the total amount of our cash; not actually taking the money out, but taking off the total of our cash, the $2,379.56, which made our cash appear that much less than it really was."

This was again done on the afternoon of June 20, 1887, after the drawee's check, which took up the draft, had been collected by the Fidelity Bank through the clearing-house. It thus appears that this fund belonging to the First National Bank of Montgomery was, so far as the book-keeping of the collecting bank could do so, separated and kept distinct from the other cash belonging to the Fidelity Bank, and was further identified by placing in the cash-drawer the transmitting bank's letter, to indicate that said excess of cash on hand belonged to that bank. The Fidelity National Bank transacted no business after June 20, 1887. It was insolvent, and the comptroller of the currency, on the morning of June 21, 1887, caused its doors to be closed, and took possession of its assets. The defendant, David Armstrong, was appointed receiver, and upon taking possession of the bank's effects he found on hand said excess of $2,379.56 more than belonged to the Fidelity National Bank, and in the cash-drawer said memorandum indicating that said excess belonged to the First National Bank of Montgomery. Finding in the cash assets of the bank this sum of $2,379.56 more than the Fidelity National Bank was entitled to, with the memorandum indicating to whom it actually belonged, the receiver, for the purpose of disposing of it, or of accounting for the same, on the 15th September, 1887, credited the amount to the First National Bank of Montgomery on the books of the Fidelity Bank. "He did that," says the clerk, "because we had this $2,379.56 more cash than our books called for."

The First National Bank of Montgomery seeks by the present suit to recover this fund, which thus came into the actual possession of the receiver. Its claim is resisted on the grounds that the Fidelity Bank never really received the money, or, if it did, the fund was mingled and blended with other cash of the bank, and cannot be so identified as to entitle the claimant to recover it, and that the Montgomery Bank can now only be regarded and treated as a general creditor of the Fidelity Bank for the amount so collected. Neither of these positions, interposed for the defense, can be maintained under the facts of the case and the law applicable thereto. It admits of no question that the Fidelity Bank did in point of fact receive and realize the amount of plaintiff's draft sent to it for collection, and that, as the result of the transaction, there was found in the collecting the bank's assets, when the same went into the hands of the receiver, the sum of $2,379.56 more cash than the Fidelity Bank was entitled to, or its books called for as belonging to it. It is equally clear that this excess was derived from the plaintiff's draft, which the Fidelity Bank actually collected. The mode or method of collection is not material. The result of the transaction was that the Fidelity Bank obtained and held $2,379.56 of funds that did not belong to it, but was justly and equitably the property of the Montgomery Bank, and this fund, having actually come into the possession of the receiver without right, cannot properly be withheld from the true owner. If, after having accepted the check of the drawee in payment of the draft sent to it for collection, the Fidelity used the check as money, and thereby retained in its coffers an equal amount in cash, how can it be said that it did not receive the money on the draft it had received for collection for account of the transmitting bank? Equitable rights and trusts are not to be adjusted and enforced on grounds so narrow and technical as defendant's position assumes.

It is well settled by the authorities, and was so held by this court in the case of *Winter's Bank* v. *Armstrong*,[1] that, under a special indorsement like that placed upon the draft forwarded for collection, the relation thereby created between the transmitting and receiving bank was merely one of principal and agent; that no act of the collecting agent could change that relation; and that the principal could follow and recover his funds so long as they could be traced and identified. The act of the receiver, on the 15th September, 1887, in crediting the Montgomery Bank with the amount of the collection on the books of the Fidelity Bank, in no way changed the agency relation of the parties, and could not lawfully operate to convert the Montgomery Bank into a general creditor of the Fidelity, and thus force it to share with other creditors in the distribution of its own funds. The old idea that because money has no ear-marks it cannot be followed when mingled with the funds of a wrong-doer, has long since been exploded. The decisions in England and in this country now allow a trust fund to be followed as long as it can be traced, and its identity ascertained, whether in its original or in some substituted form. A leading case on this subject is *Taylor* v. *Plumer*, 3

---

[1] No opinion filed.

Maule & S. 562, where the trust fund was traced through several changes; Lord ELLENBOROUGH holding that the property in its new form still belonged to the principal, notwithstanding the changes which the agent had made in its character. He laid down the principle, since generally recognized, that "the product of or substitute for the original thing still follows the nature of the thing itself so long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fails." In *Knatchbull* v. *Hallett*, 13 Ch. Div. 696, the beneficial owners were allowed to follow their trust funds into the agent's or bailee's bank-account, and into certain bonds in which it had been invested. In *Overseers* v. *Bank*, 2 Grat. 544, an attorney, having collected money for his clients, deposited the same in the bank in his own name, and mixed with his own funds. The rightful owner was allowed to recover it, tracing it simply as a gross sum; the court holding that whether the fund remain in the hands of the agent or of his representative or assignee, it could be followed until it was transferred to some *bona fide* purchaser or assignee for value without notice. So, in *Whitley* v. *Foy*, 6 Jones, Eq. 34, an agent had deposited his principal's funds in his own name. The principal was allowed to follow and to recover the same. The same rule was applied in *Kip* v. *Bank*, 10 Johns. 63, where the trustee had deposited the trust fund in bank in his own name. The trustee became insolvent, and the funds so deposited passed into the hands of his assignee in insolvency. The beneficiaries were allowed to follow it; KENT, C. J., saying that the necessary requirement of distinguishing the trust fund was met by showing that it went into the bank deposit, and thence into the hands of the defendants. That the right to follow and recover trust or *quasi* trust funds does not cease until "the means of ascertainment fail," is settled by numerous later cases, which need not be noticed in detail. See *Van Alen* v. *Bank*, 52 N. Y. 1; *Cragie* v. *Hadley*, 99 N. Y. 131; *Long* v. *Majestre*, 1 Johns. Ch. 305; *Bank* v. *King*, 57 Pa. St. 202; *Cook* v. *Tullis*, 18 Wall. 332; *Bank* v. *Insurance Co.*, 104 U. S. 54; *Schuler* v. *Bank*, 27 Fed. Rep. 424. In the present case the means of ascertainment of the plaintiff's fund have not failed. Its money has been clearly traced into the possession of the Fidelity Bank, and thence into the hands of the receiver, who is in no sense an assignee or transferee for value, so as to defeat the plaintiff's right to follow and recover its property. It follows that the plaintiff is entitled to a decree against the defendant for the recovery of said sum of $2,379.56, with costs of suit. No interest will be allowed on the $2,379.56 while held by the receiver, as he has not made interest on the funds. A decree will be entered awarding plaintiff the said fund of $2,379.56, with costs of suit.