### In re M. E. DUNN & CO.

(District Court, E. D. Arkansas, W. D. January 17, 1912.)

1. BANKRUPTCY (§ 155*)—TRUSTEES—RECEIVERS—EQUITABLE LIENS.

Trustees and receivers in bankruptcy take the assets of the bankrupt, in the absence of fraud, subject to all equitable liens in favor of third parties to the extent that such assets have been augmented by the wrongful act of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 155.*]

**2.** BANKRUPTCY (§ 140*)—TRUST FUNDS—RECOVERY—IDENTIFICATION.

Trust funds, which have been fraudulently diverted or appropriated by a bankrupt, may be recovered from his receiver whenever such funds are susceptible of identification in the hands of the possessor, or, if they have been intermingled with the general funds of the trustee so as to render their identification impossible, a court of equity (or bankruptcy) will follow them and decree restitution to the cestui que trust if the unlawful appropriation resulted in increasing the assets of the insolvent and came into the trustee's possession.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

**3.** BANKRUPTCY (§ 140*)—TRUST FUNDS—MISAPPROPRIATION.

Where a bankrupt, after misappropriating trust funds, mingled them with its own by depositing them in its general bank account, and then all the money was withdrawn from the account, the right of the cestui que trust to follow and recover the amount of its interest in the fund was lost, notwithstanding the subsequent deposit of other moneys obtained from other sources to the credit of the account.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

**4.** BANKRUPTCY (§ 140*)—TRUST FUNDS—CONSTRUCTION OF TRANSACTION.

Where intervener bought goods from the bankrupt and gave a check in settlement, such transaction constituted a purchase and sale, and hence the check or its proceeds could not be treated as a trust fund because of rights arising out of other transactions intervener might have paid for the goods by crediting the bankrupt's account.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

**5.** BANKRUPTCY (§ 140*)—TRUST FUNDS—DEPOSIT—RIGHTS OF TRUSTEE—STATUTES.

Where a bankrupt mingled trust funds with his own by depositing them in a bank account standing in his own name, the fact that the money was not earmarked did not preclude the cestui que trust from establishing its claim thereto if it could otherwise show that the misappropriation augmented the assets that came into the hands of the bankrupt's trustee, since Bankruptcy Act July 1, 1898, c. 541, § 47, subd. a, cl. 2, 30 Stat. 557 (U. S. Comp. St. 1901, p. 3438), as amended by Act Cong. June 25, 1910, c. 412, § 8, 36 Stat. 840, giving to the trustee the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings, did not prevent the cestui que trust from rebutting the presumption that the deposit belonged to the bankrupt and showing that a portion or all thereof in fact was the proceeds of a trust fund belonging to intervener.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of bankruptcy proceedings of M. E. Dunn & Co., in which Scott-Mayer Commission Company intervened, to enforce an alleged constructive trust. Decree for intervener.

This is an intervention by the Scott-Mayer Commission Company for some funds now in the hands of the receiver in bankruptcy in this cause, claiming that they are trust funds equitably belonging to the intervener. The testimony is practically undisputed, and from this testimony the court finds the facts as follows:

On or about November 1, 1911, the bankrupt, who was a merchandise broker in the city of Little Rock, representing among others the Fowler Fruit Company of Fowler, Cal., took orders for the Fruit Company for raisins and dried peaches from a number of parties, including the intervener. These orders were sent by the bankrupt to the Fruit Company, and on November 13, 1911, that company sent the goods ordered, which were packed in boxes, duly marked and easily identifiable, in one car load to Little Rock, Ark., consigned to shipper's order. The bill of lading received by the company was attached to a draft drawn on the intervener for the amount due for the

entire shipment, which amounted to $3,445.70. It also sent by mail to the intervener an itemized statement showing the goods shipped to fill its order, and also what goods were to be delivered, after payment of the draft, to other parties whose orders were included with theirs by the bankrupt brokerage company. The car with the merchandise arrived in Little Rock on November 29, 1911, and was shunted to the switch track back of intervener's warehouse on November 30th. That being Thanksgiving Day, it was not unloaded until the morning of December 1, 1911, and all the goods were placed in intervener's warehouse. The draft for all the merchandise, that intended for the intervener as well as the other parties, was paid by the intervener, and the bill of lading, which entitled them to the possession of the merchandise, assigned to them.

Among the goods so consigned were the following for other parties: Plunkett-Jarrell Grocer Company, $203.75; M. E. Dunn & Co., $1,476.82.

The shipment to M. E. Dunn & Co. was to cover orders it had taken from the following among other parties: Collins-Hampton Grocer Company, Fordyce, Ark., $543.55; L. W. Dillard, Monticello, Ark., $304.22; L. W. Dillard, Monticello, Ark., $32.53; Arkansas Wholesale Grocer Company, ElDorado, Ark., $260.42; Cotton-Veazy Grocer Company, Dardanelle, Ark., $76.35; Harris Wholesale Grocer Company, Junction City, Ark., $46.10.

There were also goods ordered for other parties who, by reason of the delay in the receipt of the goods, had countermanded the orders, and which were thus left in the hands of the bankrupt. Plunkett-Jarrell Grocer Company took the goods consigned to them and paid for the same to the intervener, and also its share of the freight for the car. The bankrupt was unable to pay its part of the freight on the goods, which amounted to $239.97. The intervener thereupon purchased from the bankrupt the goods countermanded by its customers, amounting to $451.81, for which it gave the bankrupt a check on its bank. In order to enable them to ship the other goods to the various parties whose places of business were in cities other than Little Rock, it was agreed between the intervener and the bankrupt that the bankrupt should give its check to intervener for the goods, amounting to $1,476.82, and pay thereafter the $239.97, its share of the freight; that, the bankrupt not having the funds in the bank to pay the check, it was further agreed that, when the goods were shipped out, they should be sent to the parties by taking a bill of lading to shipper's order and attach to the bill of lading a draft for the amount due from them, which drafts, with the bills of lading, were to be deposited by the bankrupt in its bank in order to make the check which it had given the intervener good. Some of the goods had been paid for before that time; the parties remitting therefor by check to the bankrupt. The amounts thus collected and then in the possession of the bankrupt were: L. W. Dillard remitted check for $304.22 on November 22d and was by the bankrupt deposited in its bank on that day; Collins-Hampton Grocer Company remitted a check for $543.55, the amount of their bill, on November 29th, which was deposited by the bankrupt in its bank on the same day.

These deposits were made in its own name and mingled with its other deposits in the bank. These amounts the bankrupt told the intervener were then in the bank and were to be held for the payment of the check it had given intervener. This was not true. The books of the bank show that on November 22, 1911, after the check of L. W. Dillard had been deposited by it, its balance was $519.01; on November 23d its balance in the bank was $822.97; on November 24th it was $607.94; on November 25th the balance in the bank was reduced to $13.72. This was increased to $92.75 on November 27th, reduced again to $72.75 on November 28th, and increased on November 29th to $1,011.03. A part of the deposit made on that day by the bankrupt was the check of the Collins-Hampton Grocer Company for $543.55 for the merchandise ordered for them. On December 1st the goods intended for these parties were taken from the warehouse of intervener, and delivered to the railroad consigned to the parties; the railroad company executing bills of lading to the bankrupt for each of the shipments to be delivered to shipper's order. Thereupon the bankrupt drew drafts on each of the parties for

the amounts due as above stated, attaching them to the bills of lading which it indorsed in blank. It being too late to deposit them in the bank on that day, they were placed in the safe. On that day, on the petition of a creditor and some of the stockholders of the bankrupt corporation, a receiver was appointed by the chancery court of Pulaski county, Ark., under the insolvency laws of the state. M. E. Dunn was the sole manager of the concern, and he had no notice of the application for a receiver until the receiver had been appointed and came to the office to take possession of the assets of the bankrupt. Among the assets he took possession of were these checks with bills of lading attached, and also the check of the intervener for the $451.81 which had not yet been deposited, but which had been certified as good by the drawee bank. He also took possession of the deposit in the bankrupt's bank, amounting to $1,011.03, claiming all of them to be the assets of the insolvent corporation.

As soon as this was done, the intervener filed a petition of intervention in the chancery court, claiming that these moneys were equitably belonging to it, to wit, $1,476.82 for the merchandise, and $239 the freight thereon. Within a few days thereafter a petition of involuntary bankruptcy was filed in this court by three creditors against the bankrupt, and, upon proper affidavits and the execution of a bond, this court appointed a receiver in bankruptcy to take charge of all the assets of the bankrupt. The receiver of the state court thereupon, by leave of the court which appointed him, turned over all the assets of the bankrupt to the receiver of this court, including the money on deposit in the bank and also the proceeds of the drafts, with the bills of lading attached, which he had in the meantime deposited in the bank and which had been collected. After the bankruptcy proceedings had been instituted in this court, the intervener filed its intervention here.

Morris M. Cohn, for intervener Scott-Mayer Commission Co.
John Bruce Cox, for receiver in bankruptcy.

TRIEBER, District Judge (after stating the facts as above). The intervener bases its right to recover all these funds, amounting to $1,714.88 to satisfy its claim of $1,716.79, of which $1,476.82 is for the goods delivered to the bankrupt, and $239.97 the proportionate part of the cost of carriage of these goods, upon the proposition that a trust was impressed upon these funds which came to the hands of the receiver as assets of the bankrupt's estate; they being the proceeds of the goods turned over to the bankrupt and which by agreement of the parties were to be paid over to them as soon as collected.

[1] Leaving for the present out of consideration the effect of section 8 of the Act of June 25, 1910, 36 Stat. 838, 840, amending the bankruptcy act, it cannot be disputed that trustees and receivers in bankruptcy, as well as all other receivers, take the assets of the bankrupt in the absence of fraud, subject to all equitable liens in favor of third parties to the extent that such assets have been augmented by the wrongful act of the bankrupt. Scott v. Armstrong, 146 U. S. 499, 507, 13 Sup. Ct. 148, 36 L. Ed. 1059; Fourth Street Nat. Bank v. Yardley, 165 U. S. 634, 653, 17 Sup. Ct. 439, 41 L. Ed. 855; York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; Bryant v. Swofford Bros., 214 U. S. 279, 291, 29 Sup. Ct. 614, 53 L. Ed. 997; In re E. M. Newton & Co., 153 Fed. 841, 83 C. C. A. 23; Gillespie v. J. C. Piles & Co., 178 Fed. 886, 102 C. C. A. 120; Dunlop v. Mercer, 156 Fed. 545, 86 C. C. A. 435.

[2] Nor could there be any doubt that trust funds which have been fraudulently diverted or appropriated can be recovered of a receiver

whenever such funds are susceptible of identification in the hands of the possessor, or, if they have 'been intermingled with the general funds of the trustee so as to render their identification impossible, a court of equity (and bankruptcy courts are courts of equity in proceedings of this nature) will follow them and decree restitution to the cestui que trust if the unlawful appropriation of the trust funds resulted in swelling or increasing the assets of the insolvent and came to the possession of the trustee. National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354, 33 L. Ed. 696; Spokane County v. First Nat. Bank, 68 Fed. 979, 16 C. C. A. 81; American Can Co. v. Williams, 178 Fed. 420, 101 C. C. A. 634; First Nat. Bank v. Armstrong (C. C,) 36 Fed. 59; Frelinghuysen v. Nugent (C. C.) 36 Fed. 239; Van Alen v. American Nat. Bank, 52 N. Y. 1.

[3] On the other hand, if, at any time after the misappropriation of the funds and mingling them with those of the wrongdoer, all the money is withdrawn, including that unlawfully mingled, the equities are lost, although moneys from other sources are subsequently placed in the same place. Or if a part of the funds so mingled is withdrawn, and the fund reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated except as to this balance. Sums subsequently added to the fund from other sources cannot be subjected to the equitable claim of the cestui que trust. Beard v. Independent District of Pella City, 88 Fed. 375, 31 C. C. A. 562; Spokane County v. First Nat. Bank, supra; Board of Commissioners v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100; American Can Co. v. Williams, supra.

Applying these principles to the facts in this cause, it is clear that unless section 8 of the amendatory act·of June 25, 1910, makes these rules of law inapplicable, the intervener is entitled to the proceeds of the drafts for the goods which came to the hands of the receiver of the state court and by him turned over to the receiver in bankruptcy and now in his possession. These claims are: L. W. Dillard, $32.53; Arkansas Wholesale Grocer Company, $260.42; Cotton-Veazy Grocer Company, $76.35; Harris Wholesale Grocer Company, $46.10; and also the proceeds of the check of the Collins-Hampton Grocer Company for $543.35, deposited by the bankrupt on November 29th and now in the possession of the receiver. The check for $304.02, received by the bankrupt for these goods on November 22d and deposited by him on that day, would also be subjected to intervener's claim but for the fact that the bank books show that the bankrupt's deposit account, which was $822.97 on November 23d, was by withdrawals reduced to $13.72 on November 25th, and again increased the next day by deposit of moneys realized by the bankrupt from other sources. The sum of $13.72 is the only sum which intervener can be entitled to from this check.

[4] The check of intervener for $451.81 is not a trust fund. Intervener bought the goods from the bankrupt and gave them a check for it. It could have credited that amount on the indebtedness due it from the bankrupt; but it saw proper to make this transaction one

of purchase and sale, and not one of principal and agent or commission merchant. Why give a check for its own goods and then ask for an accounting? The reason given that it had accepted a check for the full amount from the bankrupt to be paid out of funds realized from the sales, and it took that sum to make the check good, is neither convincing nor persuasive. If this transaction was not a separate purchase, that sum could have been deducted from the amount due from the bankrupt, and its check made for that much less. For these reasons the intervener is not entitled to a decree for that sum in any event.

[5] The next question to be determined is: What is the effect of the amendatory act of 1910. By the terms of that act the trustee in bankruptcy "shall be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon." The trustee, therefore, is entitled to the same rights an execution creditor would have if the money in controversy had been seized by an officer under a writ of attachment or execution, or, if deposited in the bank, a writ of garnishment had been served on the depository. Would such proceedings defeat the claim of intervener?

If a deposit is made by one describing himself as agent, attorney, or trustee, the rule of law, according to the great weight of authority, is that presumptively he is the owner of the funds, and the deposit is subject to garnishment by his judgment or attaching creditor; but this is only a presumption which may be rebutted by the principal or true owner of the funds, who, if successful, will have priority over the creditor. Ingersoll v. First Nat. Bank, 10 Minn. 396 (Gil. 315); Jones v. Bank, 44 Pa. 253; Proctor v. Greene, 14 R. I. 42; Des Moines Cotton Mill v. Cooper, 93 Iowa, 654, 61 N. W. 1084; Cunningham v. Bank of Nampa, 13 Idaho, 167, 88 Pac. 975, 121 Am. St. Rep. 257, 10 L. R. A. (N. S.) 706; Petty v. Dunlap, 99 Ga. 300, 25 S. E. 697; Silsbee State Bank v. French Market Grocery Co. (Tex.) 132 S. W. 465, 34 L. R. A. (N. S.) 1207.

The court can conceive of no reason why the same rule does not apply when the money is deposited by the agent in his own name without the addition of the word "agent" or "attorney" and mingled with his own funds. An attaching or execution creditor is not a bona fide purchaser entitled to the protection the law affords such purchasers. He can only acquire by the seizure such title or interest as the execution defendant has. The rule that, as money has no earmarks, every one is to be treated as an innocent purchaser, has been modified in cases of this nature. As stated by Judge Jackson, later Mr. Justice Jackson, in First National Bank v. Armstrong, supra:

"The old idea that, because money has no earmarks, it cannot be followed when mingled with the funds of a wrongdoer, has long since been exploded. The decisions in England and in this country now allow a trust fund to be followed as long as it can be traced, and its identity ascertained, whether in its original or in some substituted form. A leading case on this subject is Taylor v. Plumer, 3 Maule & S. 562, where the trust fund was traced through several changes; Lord Ellenborough holding that the property in its new form still belonged to the principal, notwithstanding the changes which the agent had made in its character. He laid down the principle, since generally recognized, that 'the product of or substitute for the original thing

still follows the nature of the thing itself so long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fails.'"

Other cases are cited by the learned judge in that opinion following the same rule of law.

In Farmers' & Merchants' Nat. Bank v. King, 57 Pa. 202, 98 Am. Dec. 215, money of the principal deposited by the agent with his own funds had been garnished by his creditors. After the garnishment, the principal demanded so much of the funds as represented the deposit of his money. In sustaining this claim the court said:

"It is undeniable that equity will follow a fund through any number of transmutations and preserve it for the owner so long as it can be identified. And it does not matter in whose hands the legal right stands. If money has been converted by a trustee or agent into a chose in action, the legal right to it may have been changed; but equity regards the beneficial ownership. It is conceded, for the cases abundantly show that, when the bank received the deposit, it thereby became a debtor to the depositor. The debt might have been paid in answer to his checks, and thus the liability have been extinguished in the absence of interference by his principal to whom the money belonged. But surely it cannot be maintained that when the principal asserted the right to the money before its repayment, and gave notice to the bank of their ownership and of their willingness that the money should be paid to their agent, their right to reclaim it had not ceased. A bank can be in no better situation than any other debtor. * * * But it is insisted there was no earmark to the money. What of that, if the money can be followed, or if it can be traced into a substitute? * * * An earmark is not indispensable to enable a real owner to assert his right to property or to its proceeds or substitute. In regard to money, substantial identity is not oneness of pieces of coin or of bank bills."

The same conclusion was reached in Packer v. Crary, 121 Iowa, 388, 96 N. W. 870, where money deposited by an agent with his own funds and mingled therewith had been garnished and then claimed by the principal.

The intervener is entitled to recover from the receiver the following sums, money now in his hands, collected from the following parties:

| | | |
|---|---|---|
| Collins-Hampton Grocer Co. | | $543 55 |
| L. W. Dillard | $13.72 | |
| " | 32.53 | 46 25 |
| Arkansas Wholesale Grocer Co. | | 260 42 |
| Cotton-Veazy Grocer Co. | | 76 35 |
| Harris Grocer Co. | | 46 10 |
| Total | | $972 67 |

A decree in accordance with the views herein expressed may be prepared and submitted to the court for approval.