## LOWELL et al. v. BROWN,
· and five other cases.

(Circuit Court of Appeals, First Circuit. November 13, 1922.)

Nos. 1562–1567.

1. **Bankruptcy ⬤159—Transfer by bankrupt not preferential, unless It depletes his estate.**

A transfer by a bankrupt is not preferential, unless it depletes his estate.

2. **Bankruptcy ⬤140(3)—Title, as to separable money or property delivered to bankrupt, held not to pass.**

The property in money paid to a bankrupt and repaid by him, like that in goods delivered and returned in specie, did not pass from the per-son paying, unless the money became so commingled with the money of the bankrupt as not to be distinguished from it.

3. **Bankruptcy ⬤164—Repayment of trust money held not preferential.**

Where money received by bankrupt under such circumstances as to create a trust ex maleficio was deposited by him in bank, and within two weeks thereafter was repaid to the equitable owners by checks on the same deposit, which had at no time been less than the amounts so received, the presumption is that it was repaid from the trust fund, and not from funds of bankrupt, and his trustee is not entitled to recover such repayments as preferential.

4. **Bankruptcy ⬤303(1)—Trustee held to have burden of proof that repayment of trust money was preference.**

It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment out of the proceeds of a bankrupt estate that proof be made that trust property or its proceeds went into a specific fund, and it is not sufficient to prove that the property or its proceeds went into the general assets of the insolvent estate; but where the trust money has been repaid by the bankrupt, and his trustee sues to recover the payment as a preference, the burden of proof rests on him.

5. **Trusts ⬤145, 358(2)—Rule as to withdrawals from deposit containing trust funds.**

If the fund into which trust moneys have been paid is insufficient in amount to satisfy all beneficiaries, the rule that as between two cestuis que trust the sum first paid in will be held to have been the first drawn out applies; but it does not apply where the trust money has been mingled with funds of the trustee, in which case he will be presumed to have drawn first from his own funds.

6. **Fraud ⬤31—Remedies available.**

One who has been induced to part with his goods or money through fraud has an election of remedies. He may rescind the transaction and recover his property, or he may affirm the transaction and sue for damages, in which case the defeasible title of the vendee becomes absolute.

Appeals from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Separate suits in equity by James A. Lowell and others, trustees in bankruptcy of Charles Ponzi, against Benjamin Brown, against H. W. Crockford, against H. P. Holbrook, against Patrick W. Horan, against Frank W. Murphy, and against Thomas Powers. Decrees for defendants, and complainants appeal. Affirmed.

For opinion below, see 280 Fed. 193.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James A. Lowell, William R. Sears, Stanley B. Hall, and Clarence M. Gordon, all of Boston, Mass., for appellants.

William H. Powers, Jr., of Boston, Mass., for appellee Powers.

Joseph P. Dexter, of Framingham, Mass., for appellee Holbrook.

John H. Devine, Devine, York & Ellsworth, and Walter A. Buie, all of Boston, Mass., for appellee Crockford.

Edward A. Counihan, Jr., and Walter A. Buie, both of Boston, Mass., for appellee Murphy.

Louis Goldberg, of Boston, Mass., for appellee Brown.

Michael J. Horan, of Boston, Mass., for appellee Horan.

Before BINGHAM and JOHNSON, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge. These six suits in equity were brought by the plaintiffs, who are the trustees in bankruptcy of one Charles Ponzi, to recover of the defendants sums paid them by the bankrupt within four months prior to the filing of the petition in bankruptcy, which payments the plaintiffs allege constitute unlawful preferences. The actions were tried together in the District Court and argued together in this court.

The transactions involved are simple. Each defendant turned over to the bankrupt a sum of money as an investment. Shortly thereafter all became satisfied that Ponzi was engaged in a fraudulent scheme, whereupon they demanded the return of their money. Each received back a check for the exact sum invested, without interest or costs. It is the return of these sums by the bankrupt to the defendants that the plaintiffs now allege constitute unlawful preferences, and which they seek to recover.

The following tabulation shows the amount and date of investment and date of the return check:

| Name | Amount | Dates Paid | Dates of Return Check |
|------|--------|-----------|------------------------|
| Benjamin Brown | $ 600.00 | July 20/20 | Aug. 2/20 |
| Benjamin Brown | 600.00 | July 24/20 | Aug. 2/20 |
| H. W. Crockford | 1,000.00 | July 24/20 | Aug. 2/20 |
| H. P. Holbrook | 1,000.00 | July 22/20 | Aug. 4/20 |
| Patrick W. Horan | 1,600.00 | July 24/20 | Aug. 4/20 |
| Frank W. Murphy | 600.00 | July 22/20 | Aug. 4/20 |
| Thomas Powers | 500.00 | July 24/20 | Aug. 3/20 |

The right of the plaintiffs to proceed on the equity side of the court has not been questioned, and we treat any objections to the form of the actions that might have been raised as waived. Warmath v. O'Daniel, 159 Fed. 87, 91, 86 C. C. A. 277, 16 L. R. A. (N. S.) 414; Gooch v. Stone, 257 Fed. 631, 634, 168 C. C. A. 581; Rosenthal v. Heller (D. C.) 266 Fed. 563.

A creditor's petition in bankruptcy was filed in the District Court for the District of Massachusetts against Charles Ponzi on the 9th day of August, 1920; he was adjudged a bankrupt on the 25th day of October, 1920; and the plaintiffs are trustees of his estate.

Charles Ponzi, as a financier, had a meteoric career, lasting from December, 1919, to August 9, 1920.

He did business under the name of "Securities Exchange Company." The record shows that, starting with a capital of $150, he owed, when he was petitioned into bankruptcy, outstanding unsecured notes amounting to $4,263,652.14, on a basis of the money invested with him. He represented to the public that he was engaged in the business of buying and selling international reply postal coupons, and dealing in foreign exchange, from which he realized enormous profits, that he was willing to share with those who were willing to invest their money with him.

His scheme consisted of selling his own notes or obligations, by the terms of which he promised to pay the amount invested with 50 per cent. addition in 90 days, but as a matter of practice, in most instances, he returned the principal with 50 per cent. addition in 45 days. The total amount of notes issued between December, 1919, and July 26, 1920, investment value, was $9,582,591.82, and on the basis of his promise to pay $14,374,755.59. ·

His transactions became a matter of public investigation the last of July, 1920. He stopped receiving money July 26, 1920. The investigation disclosed that he was receiving money from new investors, with which he paid the notes and interest of earlier investors. As his receipts rapidly increased all the time, it was easy for him to meet his maturing obligations, even before they became due. He made no substantial investments from which he derived a profit, but deposited the money in banks as fast as he received it, from which he checked it out to pay maturing notes. He was so well advertised by the recipients of early profits that his fame as a financier spread rapidly, and by the middle of July, 1920, his operations had extended over most of New England and beyond, with branch offices in many cities, and with weekly receipts approximating $1,000,000.

His scheme was a gigantic fraud from start to finish. As he was paying 10 and 15 per cent. to his agents and maintaining an office force, in addition to the enormous rate of interest paid, it is apparent that he was insolvent from the start, and became more so with each note issued.

While the six cases tried differ in some respects, in the main they are alike, in that they are all technical preference suits brought to recover money from Ponzi investors, who, upon discovering the fraud perpetrated on them, were fortunate enough to present their notes for cancellation and receive back the amounts invested, without diminution and without interest additions. Therefore the main issues in the several cases are alike, and permit the consideration of them as a single case.

[1, 2] The defendants' transactions were with the Boston office, and, as they received back only so much as they paid in, it cannot be said that their transactions added to or depleted the bankrupt's estate that he otherwise would have had. It is a well-settled principle of bankruptcy law that there can be no preferential transfer without a depletion of the bankrupt's estate, and unless it can be shown that the defendants' money became so commingled with the money of the bankrupt as not to be distinguishable from it, property in it never passed out of the defendants to the bankrupt. Had it been goods that the defendants had turned over to the bankrupt, and they had received the same goods back, the case would present no serious difficulties. People's National Bank v.

Mulholland, 228 Mass. 152, 117 N. E. 46; In re Gold, 210 Fed. 410, 127 C. C. A. 142; In re Hamilton Furniture & Carpet Co. (D. C.) 117 Fed. 774; Illinois Parlor Frame Co. v. Goldman, 257 Fed. 300, 168 C. C. A. 384.

Are the defendants to be barred from retaining what was and is their own, because the transactions involved money or checks instead of goods? Looking at the matter from a purely equitable viewpoint, as between the bankrupt and the parties defrauded, the rights of the latter ought to be the same whether the transactions involved goods or money. If the equities are equal, in the interest of justice, it is the duty of the court to uphold the right of rescission, unless it contravenes some binding principle of law.

Unless superior rights of third parties have intervened, the defendants ought to be permitted to retain their money.

[3] It is found as a fact that all the money paid the bankrupt by the defendants was deposited by him, not later than the day succeeding payment, in the Hanover Trust Company. It is also found that the sums paid in were repaid, on the dates set forth in the above tabulation, by checks drawn on the Hanover Trust Company. At no time between July 20 and August 4, 1920, was the bankrupt's deposit in said bank less than the aggregate amount of defendants' claims. There were deposits and withdrawals by the bankrupt on his account in the intervening time; but the presumption is, where trust money, or money charged with a trust ex maleficio, is commingled with the general funds of the debtor, and payments are made therefrom, that the debtor first exhausts his own, before paying out the trust funds. Importers' & Traders' National Bank v. Peters, 123 N. Y. 272, 25 N. E. 319; Southern Cotton Oil Co. v. Elliotte, 218 Fed. 567, 134 C. C. A. 295; Smith v. Mottley, 150 Fed. 266, 88 C. C. A. 154; Hewitt v. Hayes, 205 Mass. 356, 91 N. E. 332, 137 Am. St. Rep. 448.

In the case of Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, 239, the rule relative to establishing a trust ex maleficio in the proceeds of money fraudulently obtained or converted, is stated by Mr. Justice Bradley as follows:

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor."

The language above quoted is cited with approval in the following cases: Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Boone County National Bank v. Latimer (C. C.) 67 Fed. 27; Standard Oil Co. of Ky. v. Hawkins, 74 Fed. 395, 401, 20 C. C. A. 468, 33 L. R. A. 739; Metropolitan National Bank v. Campbell Commission Co. (C. C.) 77 Fed. 705; Beard v. Independent Dist. of Pella

City, 88 Fed. 375, 31 C. C. A. 562; Terre Haute & I. R. Co. v. Cox, 102 Fed. 825, 836, 42 C. C. A. 654; American Can Co. v. William (C. C.) 176 Fed. 816; In re Stewart (D. C.) 178 Fed. 463, 472.

The modern doctrine follows the principle announced in Re Hallett's Estate (Knatchbull v. Hallett) 13 Ch. Div. 696, which holds in effect that, if money held by one in a fiduciary character has been paid by him to his account at his bank, the person for whom he held the money can follow it, and has a charge on the balance in the banker's hands, and that, if the depositor has commingled it with his own funds in the bank, and afterwards drawn out sums upon checks in the ordinary manner, he must be held to have drawn out his own money in preference to the trust money, and that if he destroyed the trust fund, by dissipating it altogether, there remains nothing to be the subject of the trust; that only so long as the trust property can be traced and followed into other property into which it has been converted does it remain subject to the trust.

In First National Bank v. Armstrong (C. C.) 36 Fed. 59, 61, Judge Jackson says:

"The old idea that, because money has no earmarks, it cannot be followed when mingled with the funds of a wrongdoer, has long since been exploded. The decisions in England and in this country now allow a trust fund to be followed as long as it can be traced, and its identity ascertained, whether in its original or in some substituted form."

In the case of National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693, it is held that, as long as trust property can be traced and followed, the property into which it has been converted remains subject to the trust, and, if a man mixes trust funds with his, the whole will be treated as trust property, except so far as he may be able to distinguish what is his. This doctrine applies in every case of a trust relation, and as well to moneys deposited in bank, and to the debt thereby created, as to every other description of property.

In the case of In re Royea's Estate (D. C.) 143 Fed. 182, it is held that, where petitioner intrusted certain money to the bankrupt for safe-keeping only, and he deposited it to the credit of his general bank account, which at all times exceeded the amount so intrusted to him, and it came into the hands of his trustee in bankruptcy, plaintiff was entitled to enforce a preferred claim on such bank balance in the hands of the trustee, though the actual money delivered to the bankrupt could not be identified.

In the case of Board of Commissioners v. Strawn, 157 Fed. 49, 51, 84 C. C. A. 553, 555 (15 L. R. A. [N. S.] 1100), Judge Lurton says:

"It is therefore a part of the rule applicable to following misappropriated moneys into a bank account that, if at any time during currency of the mingled account the drawings out had left a balance less than the trust money, the trust money must be regarded as dissipated except as to this balance, the sums subsequently added to the account from other sources not being attributed to the trust fund."

In the case of Empire State Surety Co. v. Carroll County, 194 Fed. 593, 605, 114 C. C. A. 435, 447, Judge Sanborn says:

"Proof that a trustee mingled trust funds with his own and made payments out of the common fund is a sufficient identification of the remainder of that

fund coming to the hands of the receiver, not exceeding the smallest amount the fund contained subsequent to the commingling * * * as trust property, because the legal presumption is that he regarded the law, and neither paid out nor invested in other property the trust fund, but kept it sacred."

See, also, Board of Commissioners v. Patterson (C. C.) 149 Fed. 229; In re M. E. Dunn & Co. (D. C.) 193 Fed. 212; Watchmaker v. Barnes, 259 Fed. 783, 170 C. C. A. 583.

[4] The authorities appear to draw a distinction between cases wherein the proof shows the trust property went into the general estate of the bankrupt and those in which the trust property is followed into some specific fund. In the first-mentioned class, recovery of the trust fund, as such, is usually denied, although numerous cases may be found appearing to extend the equitable principle of recovery of trust funds that far. Lucas County v. Jamison (C. C.) 170 Fed. 338; Western German Bank v. Norvell, 134 Fed. 724, 69 C. C. A. 330; Richardson v. New Orleans Coffee Co., 102 Fed. 785, 43 C. C. A. 583; Smith v. Township of Au Gres, Mich., 150 Fed. 257, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876.

It appears to us that the weight of authority limits recovery to the second class, and we hold that it is indispensable to the maintenance by a cestui que trust of a claim to a preferential payment out of the proceeds of a bankrupt estate that proof be made that trust property or its proceeds went into a specific fund. It is not sufficient to prove that the trust property, or its proceeds, went into the general assets of the insolvent estate. In re Mulligan (D. C.) 116 Fed. 715; Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354, 33 L. Ed. 696; Zenor v. McFarlin, 238 Fed. 721, 151 C. C. A. 571; Lowe v. Jones, 192 Mass. 94, 78 N. E. 402, 6 L. R. A. (N. S.) 487, 116 Am. St. Rep. 225, 7 Ann. Cas. 551; Bank Commissioners v. Trust Co., 70 N. H. 536, 548, 49 Atl. 113.

Proof that defendants' money was deposited in the Hanover Trust Company, and that at no time between the dates of deposit and the dates of rescission and withdrawal was the bankrupt's account depleted to a sum less than the aggregate amount of defendants' claims, is considered by us as sufficient proof that defendants' money remained in the specific fund, within the principles stated in the authorities cited. Empire State Surety Co. v. Carroll County, 194 Fed. 593, 114 C. C A. 435; In re A. Bolognesi & Co., 254 Fed. 770, 166 C. C. A. 216, Southern Cotton Oil Co. v. Elliotte, 218 Fed. 567, 134 C. C. A. 295.

The facts in the cases at bar differ in one material respect from those cited, although the same principles are involved. In the present cases the parties defrauded are not seeking to follow their money into the hands of the trustees. The process is reversed. The trustees are seeking to show that the money received by the defrauded persons belongs to the general estate of the bankrupt. Clearly the burden of proof is upon the trustees. When it appears, as it does, that the defendants, upon discovering the fraud, went to the bankrupt, surrendered their notes, demanded the return of their money, and received checks drawn upon a specific fund in the same bank in which their money had been deposited a few days before, we cannot say that they got money belonging to the bankrupt, and not their own, or proceeds

of their own, within the meaning of the equitable principle of law permitting the following and recovery of trust funds.

The terse statement of Mr. Justice Day in the case of Gorman v. Littlefield, 229 U. S. 19, 25, 33 Sup. Ct. 690, 57 L. Ed. 1047, to the effect that no creditor of the bankrupt can demand that the estate of the bankrupt be augmented by the wrongful conversion of property of another, or the application to the general estate of property which never rightfully belonged to the bankrupt, is in point.

We do not understand that our decision is contrary to the principles laid down by the Supreme Court in the case of National City Bank v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115, relied on by the plaintiffs. In that case no question of fraud was involved. What is said by Mr. Justice Holmes in 231 U. S. at pages 57, 58, of the opinion (34 Sup. Ct. 21, 58 L. Ed. 115), is sufficient to distinguish the facts in that case from those in the case at bar. He says:

"It is not like the case of property wrongfully mingled with general funds and afterwards traced. All that the parties agreed either expressly or by implication was that the debt incurred at ten o'clock should be paid by three. * * * The consent to become a general creditor for an hour, that was imported, even if not intended to have that effect, by the liberty allowed to the firm, broke the continuity and established the loan as part of the assets. No doubt many general creditors have increased a bankrupt's estate by their advances, but they have lost the right to take them back. Time sometimes can be disregarded when it is insignificant. But in this case half the time between the loan and the transfer of securities sufficed to change the position of the borrowers from a fortune of half a million to a deficit of double that amount."

If the issues in this case were not complicated by the fact that all the money in the Hanover Trust Company was money received by Ponzi as a result of his fraud, it would be unnecessary to prolong this discussion.

[5] The plaintiffs call attention to the rule in Clayton's Case, 1 Mer. 572, claiming it governs these cases. By this rule withdrawals from a fund belonging in equity to several persons, and insufficient to satisfy their claims in full, are charged against deposits to the fund in the order of the receipts of these deposits. Claimants share in the fund in the inverse order in which their moneys went into it.

The true application of the rule in Clayton's Case is pointed out in Re Hallett's Estate, 13 Ch. Div. 696. It is there held that if a person, who holds money as a trustee or in a fiduciary character, pays it to his account at the bankers, and mixes it with his own money, and afterwards draws out sums by checks in the ordinary manner, that the rule in Clayton's Case, attributing the first drawings out to the first payments in, does not apply, and that the drawer must be taken to have drawn out his own money in preference to the trust money.

But if the fund into which trust moneys have been paid is insufficient in amount to satisfy all beneficiaries, then it is held (Frye, J.) that as between two cestuis que trust, whose money the trustee has paid into his own account at his banker's, the rule in Clayton's Case applies, so that the first sum paid in will be held to have been the first drawn out.

It does not appear that the money in the Hanover Trust Company was ever depleted to a sum insufficient to pay all of Ponzi's victims who sought rescission from that fund. The rule of Clayton's Case is not applicable.

[6] Ponzi had a defeasible title to the money he received from his victims. Donaldson, Assignee, v. Farwell et al., 93 U. S. 631, 23 L. Ed. 993. One who has been induced to part with his goods or money through fraud has an election of remedies. He may rescind the transaction and recover his property, in which case title never becomes absolute in the vendee; or he may affirm the transaction and bring an action for damages, in which case the defeasible title of the vendee becomes absolute.

Ponzi's victims may be divided into two classes: Those who became convinced that he was an impostor engaged in a fraudulent scheme, and who rescinded their transactions and received back what they paid in; and those who for the sake of a large profit risked their money with him until it was too late to get it back. The defendants are typical of the first class. The creditors represented by the trustees include the second class. The second class having played the game and lost, the trustees are now seeking contribution, in their behalf and that of other creditors, from the less daring, but more fortunate, first class.

If there are some investors, who from one cause or another were not able to present their notes in time to get their money back, their special rights are not represented by the plaintiffs. Those who could get their money back and did not, knowing, as they must, from the time the MacMaster's expose was published August 2, that Ponzi was an impostor, affirmed their investments, and are not entitled to rescind. Their money became a part of the bankrupt's general estate.

The transactions here involved all occurred between July 20 and August 4, inclusive. On July 26 Ponzi stopped receiving money from investors.

The total amount of money in Ponzi's account at the Hanover Trust Company during the period covered by these transactions was $5,216,-838.35, made up as follows:

| | |
|---|---:|
| Amount in bank morning July 19 | $ 334,726.69 |
| Received from victims | 3,726,660.96 |
| Transferred from other banks or accounts | 1,155,450.70 |
| Total | $5,216,838.35 |
| Withdrawals during period | 4,833,165.15 |
| Balance at close of business August 4 | $ 383,673.20 |

His deposits, not listed as transfers from other banks, continued beyond July 26, the date when he stopped receiving money. Between July 27 and August 4, he deposited $3,154,999.37, of which $1,155,-450.70 was transferred from other banks.

This leaves $1,999,548.67 received from investors on or before July 26 and that had not been deposited at the close of business on July 26. The record is silent as to the classes of victims from which these deposits were received, or the amount received from each class. There were only two days, August 2 and August 3, when the balance in the

account was less than the amount on deposit at the opening of business July 19. His smallest balance at the close of business any day was August 3, when the account was drawn down to $20,165.67.

During the intervening time a "run" was in progress, and his Boston office was besieged by his victims clamoring, some for the return of their money, others for the payment of their matured notes.

The computations we have made are useful only for the purpose of illustrating the impossibility of determining from the records either when or from what persons other than the defendants the deposits were received.

What is said of the receipts is true of the disbursements. The record shows that $4,833,165.15 was paid out, but it does not disclose how much was paid on account of matured obligations, or how much was returned to victims asking the return of their money. From anything appearing in the record, all who invested between July 19 and August 4 may have received their money back, as much more was paid out than was received from investors during that period.

But why should we speculate? Conceding that all the money handled by Ponzi originally came from his victims, yet the money deposited between July 19 and August 4 was no doubt a mixed account, made up of money received from those who held their notes until maturity, those who were willing to take a chance and hold on until their notes matured, and those who sought to rescind. The first two classes have lost their right to rescind, and title to the money they invested was in the bankrupt. Absolute title to the money of those who rescinded as soon as they discovered the fraud never vested in the bankrupt. The defendants come within the last-mentioned class.

Holding, as we do, that the burden of proof is upon the plaintiffs, we cannot say that the money the defendants received was charged with a trust in favor of any one else. As between the general creditors of the bankrupt, who lost their right to rescind (National City Bank v. Hotchkiss, supra), and the defendants, who did rescind, the former cannot demand that the estate of the bankrupt be augmented by the application to the general estate of property that never rightfully belonged to the bankrupt (Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047).

Our conclusions make it unnecessary to consider the additional question of infancy raised in the Brown Case.

In each case the decree of the District Court is affirmed, with costs to the appellee.