# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### In re YOUNG.

### ABRAMS v. EBY.

(Circuit Court of Appeals, Fourth Circuit. December 5, 1923.)

### No. 2138.

1. **Bankruptcy ⬡⬡22—Principles of equity applied, where no solution offered by statute.**

    In bankruptcy proceeding, where no solution of question involved is offered by any provision of the Bankruptcy Act, it becomes necessary to apply principles of equity appropriate to the facts in the ascertainment of claims and distribution of funds.

2. **Bankruptcy ⬡⬡140(3)—Joint adventurer must account for "profits" taken from capital fund.**

    Where bankrupt fraudulently conducted a "blind pool" for the purpose of buying and selling securities, as a common enterprise, and there was a common fund, contributed to by all the customers, and no actual profits, all sums paid as profits to one adventurer from the common fund was an unjust enrichment of that adventurer, and equity requires that he should account for all sums paid to him before he can share with others in the fund on hand.

Appeal from the District Court of United States for the District of Maryland at Baltimore; John C. Rose and Morris A. Soper, Judges.

In the matter of the estate of Frank M. Young, bankrupt; C. Arthur Eby, trustee. From a decree affirming report of referee, and disallowing his claim, Michael A. Abrams appeals. Affirmed.

Philip B. Perlman, of Baltimore, Md. (Marbury & Perlman, of Baltimore, Md., on the brief), for appellant.

C. Arthur Eby, of Baltimore, Md. (J. Henry Baker and Charles E. Orth, both of Baltimore, Md., on the brief), for appellee.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WOODS, Circuit Judge. The appeal is from a decree of the District Court, affirming the report of the referee and disallowing the

⬡⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

294 F.—1

claim of Michael A. Abrams for $2,000 against the bankrupt estate of Frank M. Young. The facts set out in the report of the referee are not in dispute. For the purposes of the appeal they may be somewhat condensed.

Beginning probably in the early part of 1919, and continuing until bankruptcy in October, 1922, Young conducted in Baltimore a "blind pool." He induced customers to pay to him for this enterprise various sums of money. For each payment he issued a receipt, providing that the amount was to be placed to the credit of the customer "in an account opened and managed by me, for the purpose of buying and selling any securities traded in on the New York Stock Exchange." Young was to have as compensation for his "management" of the account "one-third of the net profits produced" to the customer; settlements to be made monthly. The customer was to have the right to "withdraw all or any part of his account upon 30 days' written notice," to be given on the 1st day of a calendar month. The receipt contained provisions that funds withdrawn should not participate in profits. As each new payment was made by a customer, the former receipt was canceled, and a new receipt issued for the aggregate amount. By August 1, 1919 Young had obtained from customers $193,400. The amount increased steadily from month to month, until by October, 1922, his liability had increased to $4,061,750, and his customers numbered more than 5,000. This increase in receipts was caused in part by the fact that Young, in the early part of 1920, paid commissions to any of his depositors who secured new customers. These commissions at first were 10 per cent. on the amounts secured, but were gradually reduced to 3 per cent. During the same period from August, 1919, to October 13, 1922, he paid out to his customers, as "profits" $2,791,274.05, and from October, 1919, to October 13, 1922, he paid on withdrawals of principal $1,309,500, of which $229,100 was withdrawn during the month of September, 1922, and $412,650 from October 1 to October 13, 1922.

In the year 1920 Young's losses aggregated $419,300.35; in 1921, $21,823.42. In the year 1922, to October 13th, he made an apparent profit of $3,726.52. The net result of his tradings for the period from January 1, 1920, to October 13, 1922, was a loss of $437,397.25. During the year 1920, when his losses in tradings amounted to more than $400,000, he paid to his customers "profits" at the rate of 58.41 per cent., aggregating $544,726.09; for the year 1921, when his losses amounted to nearly $22,000, he paid to his customers as "profits" $883,586.69, at the rate of 44.92 per cent.; and for the year 1922 to October 13th, when his trading profits were nearly $4,000, he paid to his customers the sum of $1,268,661.27, at the rate of 37.25 per cent. For the period from January 1, 1920, to October 13, 1922, he paid to his customers as "profits" a total sum of $2,696,974.05, when for that period his tradings resulted in a net loss of $437,397.25; so that whatever so-called profits he paid out were taken from the principal sums deposited by his customers.

From time to time false statements were sent each customer, showing on their face large profits to his credit. Separate accounts were

actually kept with customers for a short time, but they were soon discontinued, and payments of all customers were put into a single fund, from which monthly payments, falsely credited as profits, were made. In this condition of the account, it is impossible to say that any particular customer was entitled at any time to the credit of a single dollar of profit. The bankrupt estate is sufficient to pay but a very small per cent. of the undisputed claims.

Abrams' payments into the pool were as follows:

| | |
|---|---:|
| April 12, 1919 .............................................$ | 400.00 |
| July 14, 1919 .................................................. | 300.00 |
| December 30, 1919 ............................................. | 300.00 |
| July 31, 1920 ................................................. | 1000.00 |
| November 29, 1920 ............................................. | 500.00 |
| November 14, 1921 ............................................. | 1000.00 |
| January 16, 1922 ............................................. | 500.00 |
| | $4000.00 |

Before March 23, 1923, Abrams had received as profits $2,283.02. On that date he withdrew $2,000 of his supposed principal. His former receipt was then canceled, and a new receipt issued for $2,000, as if that sum had been paid in cash on March 22, 1923. Afterwards Abrams received $513.80 as profit on this $2,000. Thus it appears that Abrams received back the entire sum of $4,000 he had put in and $796.90 in addition.

[1] Thus arises Abrams' claim of $2,000 and the assertion that it is his right to have it share equally with the claims of those victims who have either received back none of the money put in, or only a part of it. No solution of the question is offered by any provision of the bankruptcy statute. It therefore becomes necessary for the court of bankruptcy to apply the principles of equity appropriate to the facts in the ascertainment of the claims and the distribution of the funds in its hands. Bardes v. First National Bank, 178 U. S. 524, 535, 20 Sup. Ct. 1000, 44 L. Ed. 1175; Dalton v. Humphreys (4th Ct.) 242 Fed. 777, 783, 155 C. C. A. 365; Searle v. Mechanics' Bank, 249 Fed. 942, 945, 162 C. C. A. 140. Statement of the relationship of the persons concerned will, we think, make it evident that equity requires the application of the rule of equality. Young's contract was to speculate in good faith in behalf of all his customers, and distribute the profits among them in proportion to their contribution, retaining one-third as his compensation. His purpose from the inception of his scheme was to prey on those who intrusted money to him. From the beginning he sent false accounts, showing apparent profits, and paid out large sums as profit, for the purpose and with the effect of deceiving his customers, and enticing others into his net. His side of the business was fraudulent from beginning to end. On any day, therefore, from the moment of the first contribution to the day of the bankruptcy, the court of equity, at the instance of any victim alleging the facts, would have enjoined the scheme as fraudulent, laid hands on the funds so fraudulently obtained, and distributed them among the victims. If none of them had been paid back anything, and none could identify the money paid in by him, the fund would have been

prorated, and each victim would have received the same per cent. of the amount paid.

Since, however, Abrams and other contributors to the funds had been paid back money by Young at the time the court took possession of the fund, the method of equitable distribution depends on the relation of the contributors to each other. They were not partners, nor members of a corporation, but all understood they were engaged in a joint enterprise; the assets consisting of Young's supposed talent as a speculator, and money in his hands arising from the separate contributions of each to the common fund. That the contributors understood they were pooling their money, to be used in speculation by Young for their common benefit, is shown by the terms of the receipts taken. There may have been some contributors who had no faith in the scheme, and put in their money with the knavish hope of receiving large profits taken by Young from the funds of later contributors. As the members of this class are unknown, and are surely entitled to no special consideration, all the contributors must stand on an equal footing, as stupid victims of a transparent fraud. Again it is to be borne in mind that there were no profits, and that all the payments made by Young were from the capital fund paid in by customers. Every cent paid to Abrams as profits was taken from the capital contributed by his coadventurers.

[2] We have, then, a common enterprise, a common fund, contributed by all the customers, a manager common to all, his breach of trust common to all, losses common to all. It follows that all sums paid as profits to one adventurer from the common fund, when there was no profit, was an unjust enrichment of that adventurer from the fund belonging to all in common, sufficient to pay but a small dividend on the capital sums actually paid in. Equity therefore requires that he should account for all sums paid to him as profit before he can share with others in the application of the funds on hand to the debts due for sums actually paid in.

Lowell v. Brown (C. C. A.) 284 Fed. 936, involved some of the assets of the notorious Charles Ponzi. There the court held that certain creditors had the right to retain payments made to them by Ponzi, by checks issued within four months of bankruptcy on a bank account in which their payments to Ponzi had been placed. The decision was rested on the principle that the beneficiary of a trust may recover his money out of any fund into which he can trace it. Without committing ourselves to the doctrine of that case, it is enough to say that here the balance for distribution is a residuum of the aggregate contribution of all the victims of Young. No part of it can be identified or traced as a payment of any particular victim.

Affirmed.