## HESS v AMIDON

Ohio Appeals, 1st Dist, Hamilton Co

Decided March 1, 1937

Peck, Shaffer & Williams, Cincinnati, and Sol Goodman, Cincinnati, for William F. Hess, trustee.

Walter K. Sibbald, Cincinnati, for C. S. Amidon.

## OPINION

**By MATTHEWS, J**

These cases are appeals from the same judgment of the Common Pleas Court of Hamilton County. While the notice of appeal in the first case stated that the appeal was on questions of fact as well as law, at the hearing the appeal was voluntarily reduced to one of law and by consent was presented as a cross appeal upon the consolidated records.

William F. Hess, as trustee in bankruptcy of D. E. Lindsey, doing business as Lindsey & Company, and Investors' Protective Service, Inc., a corporation under the laws of Ohio, was plaintiff in the trial court, and Dr. C. S. Amidon was the defendant. A judgment was rendered in the plaintiff's favor for $320.00. He appealed and claims here that he should have judgment for $3760.00. The defendant appealed, asserting that as a matter of law judgment should have been rendered in his favor for costs and asked this court to render the judgment in his favor, which the trial court should have rendered.

Commencing in 1932, D. E. Lindsey was engaged in buying and selling corporate securities, with money or securities furnished by others. He made these purchases and sales through established licensed brokerage institutions, and at no time complied with the law so as to become a licensed dealer in securities himself. In other words he became a customer of certain brokers and dealt with them under certain names, such as Lindsey & Co., Lindsey & Lindsey, and Investors Protective Service, Inc., which latter was a corporation apparently without substance, organized by him, of which he described himself as the manager. For the purposes of this case, this corporate entity may be disregarded. Lindsey invested no money or securities of his own in these brokerage accounts. It was all furnished by his customers, of whom Dr. C. S Amidon was one.

In 1933, Dr. Amidon paid to Lindsey $4000.00. During the entire period Lindsey was engaged in this business, about two hundred persons paid money or delivered securities to him, which he used according to their intention to buy and sell securities. The aggregate amount invested was more than $300,000.00.

The purpose of all the investors was, of course, to realize a profit and the arrangement with Lindsey limited his interest to a percentage of either the gross or net profits.

Before August, 1934, Lindsey paid to Dr. Amidon $2320.00 on accounting to him for profits made. Sometime thereafter, Dr. Amidon desired the return of the original amount and so notified Lindsey. In response, Lindsey paid him $2000.00 of the original $4000.00 invested. Others withdrew all or part of their original investment. Lindsey alone computed the profits, and, because of an unsound basis of calculation and also because of failure to comply with the law relating to dealers in securities, he found himself in difficulties. It was not until then that his customers had any dealing with one another unless it can be said on the evidence that they had constituted Lindsey as their agent to establish a jural relation inter sese. When Lindsey's business failed to function smoothly, that fact soon became known to his customers and they, or some of them, joined together to investigate. Finally, in 1935, a receiver was appointed by the Common Pleas Court of Hamilton County and later bankruptcy proceedings were instituted, in which the plaintiff was appointed trustee. At that time, whatever remained of the customers' property was not in the possession of Lindsey, but in the possession of certain brokerage institutions in accounts established by him.

Dr. Amidon did not participate in the bankruptcy proceedings in any way. He was not scheduled as a creditor or debtor. He received no notice of its institution or pendency or of any proceeding therein against him. Nor did he enter his appearance or in any other way consent to assumption of jurisdiction by that court. That court could not therefore render any judgment or make any order that would impose a personal liability upon Dr. Amidon or limit him in defending an assertion of personal liability against him. This results from the Fifth Amendment to the Constitution of the United States, which applies to bankruptcy proceedings in Federal courts. Louisville Joint Stock Land Bank v Radford, 295 U. S. 555, 1 O.O. 130. In that case it was said: "The bankruptcy, like the other great substantive powers of Congress is subject to the Fifth Amendment." Congress conferred upon the United States District Court jurisdiction to administer the estates of debtors and distribute the proceeds among their creditors according to their respective rights, and to grant discharges

to debtors when jurisdiction was properly invoked. The jurisdiction conferred is over the res—the debtor's property and over the debtor. Congress did not assume to, and could not, confer jurisdiction █ to render a personal judgment against a third person without notice to such person and an opportunity to be heard. The case bears no resemblance to those in which a trustee in bankruptcy under the orders of the court exercises the power of directors of a corporation to call for payment of unpaid stock subscriptions. And in those cases it is always recognized that notwithstanding the direction of the bankruptcy court to the trustee to sue, the subscriber can only be held in a plenary action in which all defenses are available to him. In Re M. Stipp Const. Co., 221 Fed. 372. Two cases are chiefly relied on as holding contrary to our conclusion in this respect. The first is Abrams v Eby, 294 Fed. 1. An examination of this case discloses that the only point decided was, that in distributing a common fund among a bankrupt broker's customers, who had traced their property or some of it into that fund, account must be taken of what had been paid by the broker to the specific customer. In other words, if a customer had withdrawn a part he had just that much less in the common fund. This case is no authority for the proposition that the trustee has a personal claim against the customer to recover any amount paid. It might be mentioned here the case is no authority for the other point upon which it was cited, to-wit: that the bankruptcy court had jurisdiction to render a personal judgment against a customer.

The other case relied on arose in the same bankruptcy proceeding. It is Eby v Ashley 1 Fed. (2d) 971. That case was a plenary action by a trustee against a customer to recover an overpayment. It is sufficient to distinguish that case by pointing out that so far as the record shows no customers or class of customers were able to identify or trace their property or its proceeds and also the record shows there were creditors. The judgment was for the recovery of an amount paid within three weeks of the bankruptcy. There was no attempt to show that this payment was made with money belonging to other customers that is, that could be traced by any other customer. As the bankrupt was insolvent at the time and made the payment without consideration, the court held it was constructively fraudulent as to his existing creditors.

No such situation is presented by the record in this case. The payments were made more than seven months before the bankruptcy. There is no allegation or proof that Lindsey was insolvent when these payments were made. Furthermore, if the item of interest is taken into consideration (and it must be if the dealings established the relation of debtor and creditor) there was no overpayment.

In the case at bar Lindsey paid the money to Dr. Amidon voluntarily, with full knowledge of all the facts, in settlement of an obligation which he professed and which Dr. Amidon believed existed. He had no reason to believe the money he received was that of any other than Lindsey. He had no reason to believe Lindsey was insolvent. Upon what principle it can be recovered we do not know.

It is possible that the differences between that case and the case at bar do not exist. If so, and that court intended to announce principles contrary to those stated in this opinion, we find ourselves unable to follow that case. In that case, the court relied upon Cunningham v Brown, 265 U. S. 1, which to our minds is not analogous at all. It involved the operations of Ponzi, and the Supreme Court found that Ponzi had obtained loans through fraud. The relation between him and his customers was that of debtor and creditor, and not that of trustee and cestui que trust. He borrowed money of his customers and gave his notes. No other relation than that of debtor and creditor was ever intended. Preferential payments had been made to certain creditors within four months. The court required the return of the preferences, which is the familiar case. There was, therefore, no question concerning the jurisdiction of the court, or of payments made by an agent on accounting to his principal.

If Dr Amidon is liable to the plaintiff it must result from his dealings with Lindsey prior to the bankruptcy proceeding and not from anything done in that proceeding.

Now the original contract between Lindsey and Amidon did not purport to authorize the former to enter into any jural relations with Lindsey's other customers. The whole meaning of it was to constitute Lindsey the agent of Amidon, authorized to buy and sell on his behalf and account periodically on the result of the operations. There is nothing in it that can be construed as

authorizing Lindsey to enter into a partnership joint enterprise, or adventure for or on behalf of Dr. Amidon. However, Lindsey did account to Dr. Amidon from time to time for his share in "group profits," and his counsel admits that Dr. Amidon must be charged with knowledge that Lindsey had commingled his money with that of some other customers. There is no proof that he ever knew the other members of the group in which he had been placed, or the amount they had invested. Nor is there any proof of the members of his group, the amounts invested or withdrawn by the other members. The admission of counsel and the evidence combined fall short of proving or tending to prove that Dr. Amidon entered into a partnership, joint adventure, or joint enterprise with Lindsey's other customers.

It is alleged that the agreement was, that the group should include all of Lindsey's customers, but there is no evidence to support the allegation.

To sustain an action for contribution or to equalize a loss it is not sufficient to show that property has been commingled. If no owner was to blame for the commingling, that proof would show an ownership in common according to their contributions to the common fund—but it would show no personal liability inter sese. And certainly, it would show no liability in favor of the wrongdoer who had commingled the funds.

This failure of proof alone is sufficient to require a reversal of the judgment against Dr. Amidon.

The evidence fails to show a cause of action for other reasons, which will be noticed.

The plaintiff asks judgment for $3760.00. This sum is the difference between $4320.00, the amount repaid by Lindsey—and the dividend from the assets on hand at the time of the institution of the bankruptcy proceedings. Upon this theory, Lindsey's customers are obliged to return to his trustee in bankruptcy all money paid to them in repayment of amount invested or in the name of profits. There would thus be accumulated by the customers in the hands of the trustee an amount equal to the total of the money originally invested by all the customers, less a declared dividend of 14%. As this dividend had been declared presumably there were sufficient assets on hand to pay it as well as 100% on the claims entitled to priority. The referee found expressly that there was sufficient money in the hands of the trustee for that purpose.

There is no allegation that Dr. Amidon would only be entitled to 14% after all those customers had returned all money paid to them by Lindsey. The allegations in fact disprove that. The total losses as alleged were $134,959.34. The expenses were $27,498.56. The total repaid to customers was $172,380.27. Assuming that Lindsey had nothing when bankruptcy intervened (which is contrary to the proof) the total loss must have been less than 50%.

The report of the accountant or auditor filed herein shows that according to his calculation $40,285.42 would be sufficient to pay the prior claims in full and leave 14% to pay on all other claims. The basis of the claim is therefore manifestly wrong, and there is no data before the court upon which it could calculate a legal contribution. And for that reason the plaintiff's prayer could not be granted.

We think it clear that a trustee in bankruptcy succeeds only to the title of the bankrupt and the right to rescind transfers in fraud of creditors and preferential payments to certain creditors.

Where the bankrupt has in his possession or under his control property belonging to others, the sole duty of the trustee is to deliver it to those entitled. And the limit of the jurisdiction of the bankruptcy court over such property is to see that the trustee performs such duty by surrendering such property. The many reclamation proceedings in bankruptcy are predicated upon this duty. By that method, the situation is called to the attention of the court and the direction of the court to the obdurate or hesitant trustee is obtained. Bankruptcy proceedings are for the benefit of creditors and if the bankrupt has possession of property, in which he has no beneficial interest, there is no occasion for the exercise of jurisdiction over it, and as soon as that fact appears control should be relinquished.

In this case, Lindsey had no beneficial interest in any of this property. It belonged to his customers. They had the complete equitable title. Every contributor could trace his contribution into specific funds. The trail was never lost. None, therefore, became general creditors, as distinguished from owners of a res. No one claims to the contrary, not even the plaintiff. We have here an instance of the bankruptcy court attempting to draw to the possession of the trustee property in which

the bankrupt had no beneficial interest, over which it could exercise no rightful jurisdiction, except to order its immediate release.

In most cases of bankrupt brokers, the great controversy revolves around whether particular customers are able to trace their property. If they are so able, the court orders it or its proceeds delivered to them unimpaired. No creditor of the bankrupt receives any of it, because it is not the bankrupt's property.

If a customer cannot identify his specific property or point to a specific fund of which it forms a part, he becomes a general creditor, for the simple reason that no res or subject-matter exists to which his title could attach. In other words, his property has been lost without a trace through the wrong of the bankrupt and his right is transmuted from a right in rem to a right in personam against the bankrupt upon the contract which he has violated.

If various customers' securities have become commingled in a special fund, the bankruptcy court orders its return to them according to their respective rights.

It should be remarked here that had bankruptcy not intervened, Lindsey's relation to these payments would not have entitled him to recover them. So far as he was concerned, they were voluntary payments, made with full knowledge of all the facts to innocent persons having no reason to doubt the truth of his representations. Under such circumstances the person paying has no cause of action against the person to whom the payment is made, and as to those injured by the payment he is a wrongdoer and liable to the extent of the injury done. We do not mean to be understood as saying that a trustee of an active trust, which he is continuing to administer, may not, under certain circumstances, rescind a contract made with one having actual or constructive knowledge of the facts under which he has wrongfully transferred trust property and recover the property so as to restore the corpus of the trust estate to its unimpaired condition. That principle can have no application to a situation where a trustee has systematically mismanaged the trust property and rendered himself ineligible to continue as trustee by becoming a bankrupt, and particularly where as in this case, whatever authority he had possessed had been revoked by the beneficial owners.

It appears in evidence that all those interested in these transactions entered into an agreement of compromise and settlement, the terms of which would have barred an action by them or any of them. We think it is clear that a settlement by beneficial owners who are sui juris is a bar to an action by the holder of the naked legal title.

Summarizing, we hold that the proceedings in bankruptcy constitute no element of a cause of action, that out of the transactions between Lindsey and Amidon no cause of action arose in favor of the former against the latter, that there is no evidence that Lindsey was authorized by Amidon to enter into a contract on his behalf with Lindsey's other customers, that assuming such a contract, it would not be an asset of Lindsey, and, therefore did not pass to his trustee upon his bankruptcy, that, assuming a contract between Lindsey's customers, there is not sufficient data to determine the rights of such customers among themselves, and, finally, that if such a relation existed among them, the admitted fact is that it was discharged by their agreement of compromise and settlement.

As it affirmatively appears that the defendant is not liable to the plaintiff, the judgment is reversed and final judgment entered for the defendant.

ROSS, PJ, and HAMILTON, J, concur.